**UNITED STATES of America ex rel. Benedetto ROMEO, Petitioner-Appellant,**

v.

**Daniel McMANN, as Warden of Clinton State Prison, Dannemora, New York, Respondent-Appellee.**

No. 158, Docket 29289.

United States Court of Appeals Second Circuit.

Argued Oct. 16, 1969.

Decided Nov. 17, 1969.

Gretchen White Oberman, The Legal Aid Society, New York City (Milton Adler, The Legal Aid Society, New York City, on the brief), for appellant.

Mortimer Sattler, Asst. Atty. Gen., State of New York (Louis J. Lefkowitz, Atty. Gen., and Samuel A. Hirshowitz, First Asst. Atty. Gen., State of New York, on the brief), for appellee.

Before FRIENDLY, HAYS and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

Mrs. Vera Rubin was shot and killed by a thief's bullet in an exchange of fire between robbers and police during an abortive holdup of Rao's Bar and Grill in New York City on September 6, 1941. This crime was still unsolved at the time John Gramando was arrested on June 15, 1945, in connection with an unrelated killing of one Anthony Spagna on October 17, 1944. When Gramando was arrested, officers found a gun in his wife's handbag and she was subsequently charged with unlawful possession of the weapon.

After Gramando had been questioned about the Spagna case and while he was still in custody, he asked to speak to a representative of the New York County District Attorney's office. At a conference on June 20, Gramando told a prosecutor that the gun found in his wife's bag was not hers but had been hidden there by him. He then volunteered to give information about a second, unsolved homicide if the assistant district attorney would help to obtain Mrs. Gramando's release from prosecution on the weapon charge. When Assistant District Attorney Dermody promised he would do everything he could to assist Gramando's wife, Gramando told about the Rubin killing. He implicated himself, the appellant Romeo, and four other men. On June 27, 1945, Gramando was indicted in the Spagna case for first degree murder; and that same day the grand jury dismissed the weapon charge against his wife.

Five days later, on August 2, Gramando testified under a waiver of immunity about the Rubin murder before the grand jury which indicted Gramando, Romeo, Samuel Cafisco and one other for first degree murder. Romeo's case was severed and tried first, commencing on April 16, 1946. Gramando and Cafisco testified for the People; and, in addition, the two off-duty police officers, whose presence had precipitated the gunfight in the Bar, identified Romeo. Gramando stated that Romeo helped plan the robbery and was an armed participant.

On cross-examination, in order to impeach Gramando's credibility, defense counsel asked about any promises made by the prosecution to Gramando about leniency or dismissal of charges in the cases involving Gramando's own two indictments for murder, his wife's weapon charge, and the charge against his brother-in-law for furnishing a gun, as inducements to Gramando to testify against Romeo. Gramando denied that his giving of testimony had been conditioned upon any such promises, except that he reiterated the fact that he had asked for and obtained the release of his wife on the weapon charge.[1]

---

1. "Q. Now around that time your wife was arrested for having in her possession a loaded revolver? A. That's right.
Q. Is that correct? A. That's right.
Q. And she was arrested, charged with possession of a firearm? A. That's right.
Q. And she went into the Magistrate's Court, and she was held for the Grand Jury? A. That's right.
Q. Is that right? A. That's right.
Q. Now isn't it a fact that between the time that she was held by the Magistrate to await the action of the Grand Jury and the day that case was presented to the Grand Jury, you went to the District Attorney's office? A. That's right.
Q. And you told the District Attorney that 'If my wife is prosecuted I will not testify'? A. I didn't say nothing of the kind.
Q. You asked the District Attorney to help her, didn't you? A. That's right.
Q. Yes. And your wife's charge of possessing a loaded firearm was dismissed by the Grand Jury of this County? A. That's right.
Q. You were promised that if you testified in this case you wouldn't be prosecuted for the killing in this case, is that correct? A. You know more than me.
Q. I know more than you? A. Yes.
Q. Perhaps I do. A. You're smarter than I am, but [sic] you know more than me.
Q. No one ever told you that? A. Nobody told me anything.

The issue now before us arose out of a donnybrook growing out of the effort of defense counsel to implant firmly in the minds of the jury the belief that the prosecution had promised, in return for Gramando's testimony against Romeo, (1) to withdraw any prosecution of Mrs. Gramando on the weapon charge; (2) to take no proceedings against Gramando for the killing of Spagna; (3) to take no proceedings against him for the killing of Vera Rubin; and (4) to make no charges against Gramando's brother-in-law for supplying a gun. In pursuit of this, defense counsel so worded his cross-examination of Gramando that the witness for the most part had to answer the leading questions in the affirmative.[2] For example, he asked, "You are not being tried for killing Vera Rubin, is that correct?" Answer: "That's right." This was literally correct, because Gramando was not then on trial for anything; but the full truth included the fact that he had been charged with that murder and was awaiting trial. There was not a scrap of evidence to show that the People did not intend to go forward with the prosecution, and this was in fact done. Gramando later pleaded guilty to first degree manslaughter in both the Spagna and Rubin cases and was sentenced to ten to twenty years in prison.

At this juncture the prosecutor, Assistant District Attorney Monaghan, sought to stop defense counsel from attempting to give the jury a false picture. He tried three times to clarify the evidence, but he was interrupted twice by defense counsel and finally by the judge, who told the jury to disregard the comments by counsel.[3] What clarification the prosecutor had in mind to make is unknown except for the comments he contributed in summation in response to defense counsel's argument that the prosecution promised Gramando to dismiss all the charges against him and his family in return for Gramando's promise to testify against Romeo.[4] But it is certain that

Q. You just came here voluntarily, without any promises, without any considerations? A. That's right. The only thing I hoped was that they would take my wife out, that's all.

Q. You wanted your wife saved? A. Yes, for my baby's sake. My baby means to me more than anybody."

2. "Q. Now let us get this straight. You weren't tried for killing Spagna, is that right? A. That's right.

Q. You are not being tried for killing Vera Rubin, is that correct? A. That's right.

Q. Your wife was not prosecuted for having a revolver? A. That's right.

Q. Your brother-in-law was not involved for giving you a gun, or giving, as you call him, Yano, a gun? A. My brother-in-law had nothing to do with this."

3. "Mr. Monaghan: Your Honor, may we get the record straight? In the way these questions are framed, he says, 'You are not being prosecuted.' He isn't being prosecuted today.

Mr. Cosentino [counsel for the defendant]: Well, he was not prosecuted.

Mr. Monaghan: There hasn't been a promise made of any kind.

Mr. Cosentino: Put it on the record that you are going to prosecute him.

Mr. Monaghan: I will put it on the record right here that a single promise—

Mr. Cosentino: Put it on the record that this stool pigeon wouldn't be tried for murder in the first degree for the killing of Vera Rubin—

Mr. Monaghan: Not a single promise ever made to this man—

Mr. Cosentino: And it will come out in the future—

Mr. Monaghan: May the record also appear—

The Court: Disregard these speeches made by the attorney for the defendant and the District Attorney. All the evidence we have in this case concerning this defendant's connection with this indictment is he is still one of the defendants; and the People, on motion made to the Court, got a severance as to this defendant, and as to the other defendant that testified, Cafisco."

4. Defense counsel in his argument said: "What charms has this man? Look at the price the District Attorney is paying for this perjurious testimony. They let his wife get away with the charge of possession of a loaded revolver. Mike Cortesi [the brother-in-law] was never charged with supplying guns. He himself was never charged

there is nothing whatever to show that Gramando did not truthfully and correctly reply to questions asked him on the witness stand. Nor is there anything to indicate that the prosecutor suppressed, deliberately or otherwise, any promise relative to Gramando's involvement in the Spagna and Rubin cases, or any promise about the charge against his brother-in-law, as consideration to Gramando either for his disclosures about an unsolved homicide or for his giving testimony against Romeo.

The only issue on this appeal concerns a claimed suppression of a promise made by the prosecution to Gramando not to continue the charge against Gramando's wife in return for Gramando's agreement to tell about an unsolved homicide. The appellant's argument centers upon his contention that Gramando answered falsely when he replied, "No, I wasn't made any promises" to defense counsel's question, "You weren't made any promise by the District Attorney for your testifying here, were you?" But Gramando did testify before the jury that he had offered to tell about the unsolved Rubin homicide if the Assistant District Attorney would help to obtain the dismissal of the weapon charge against Mrs. Gramando. It was clearly before the jury that an agreement had been made, and the jury also knew that the charge against Mrs. Gramando had been dropped and that Gramando had told the District Attorney's office about the Rubin case. There was no evidence then, nor apparently has anything appeared since, to show that at the time the bargain was made Gramando agreed to testify against Romeo, though at the trial he did testify against him.

Appellant's complaint ultimately reduces itself to a claim that the mutual promises of the bargain appear in a somewhat imprecise state and that a duty rested upon the prosecution to clarify them. But the record makes it entirely clear that Gramando's answer, that he received no promises for testifying against Romeo, was not a contradiction of his testimony that he was afforded help in getting the charges against his wife dismissed in return for telling about the Rubin case. Defense counsel had ample opportunity to cross-examine on the details of the bargain regarding the dismissal of the charge against Gramando's wife and whether

with violation of parole. He was not tried for the killing of Spagna. And he hasn't been tried for the killing of Vera Rubin. And, mark you, gentlemen, he will never be tried for the killing of Vera Rubin. That is some price to pay for the testimony of the likes of that!"

The Assistant District Attorney made reply in his own summation as follows:
"You have heard their stories. He says the State is paying an awful price for the testimony, that the slate is going to be washed clear. He knows better than that. He knows that any disposition of their case or cases has to come before the court. He knows that a full and frank disclosure has to be made to the court, and it is not up to the District Attorney, it is up to a duly elected Judge of General Sessions to say what disposition will be made.
Mr. Cosentino: We know that that is not correct, your Honor. The District Attorney makes the recommendation to the Court.

Mr. Monaghan: In the final analysis, is it the court who—
Mr. Cosentino: But it is the District Attorney who makes the recommendation to the court.
The Court: I don't know what recommendation you are talking about.
Mr. Cosentino: We are talking about what they are going to do with Cafisco and Gramando in the future.
The Court: The District Attorney can make a recommendation. The court can follow it or refuse to follow it.
Mr. Cosentino: But it is the District Attorney who makes the recommendation.
Mr. Monaghan: And it is the court who says yes or no, not the District Attorney. And give us credit for having some brains. A man who admits to two killings, turn him out? Give us credit for some brains, will you? The name of Pauline Gramando, the wife, not charged with a weapon. The case was presented to the Grand Jury, and the Grand Jury, not the District Attorney, voted no bill."

they expressly or implicitly included a promise on Gramando's part to testify against Romeo, but he didn't bother to do so. It is quite apparent that he was much less interested in clarification than he was in obfuscation, in the hope that he could make the jury think that the prosecution bargained away all charges against Gramando, his wife and his brother-in-law in return for Gramando's promise to testify against Romeo. His summation[5] reveals this, though evidence to support his statements is lacking.

The jury found Romeo guilty of first degree murder, and on its recommendation he was sentenced to life imprisonment. In a new trial motion based on a claim of newly discovered evidence, Romeo first raised his contention that Gramando committed perjury by denying that promises of leniency had been made and that the prosecutor made statements in summation which "buttressed" the perjury. This motion was denied, and both the conviction and the denial of the new trial motion were affirmed by the Appellate Division.[6] Leave to appeal to the New York Court of Appeals was denied June 14, 1948.

On September 30, 1960, Romeo sought a writ of error *coram nobis* to vacate the conviction, again alleging that the prosecutor deliberately suppressed the fact that Gramando lied about the absence of promises of leniency. A hearing was held, at which Assistant District Attorney Dermody confirmed an offer to help Gramando's wife, but denied any promises of leniency toward the witness himself. Gramando testified at this hearing that he had received other promises as well; but the judge did not credit these statements, and denied the writ.[7] The Appellate Division reversed by a majority of 3–2 and ordered a new trial.[8]

The Court of Appeals then unanimously reversed the Appellate Division, stating in its *per curiam* opinion[9] that a reading of the record made clear that any defect in the prosecutor's conduct "could not have affected the jury's appraisal of Gramando's credibility." The Supreme Court denied certiorari.[10]

When the appellant raised the argument once again in his application for a federal habeas corpus writ, the court below rejected it in much the same language as that used by New York's Court of Appeals: "The statements complained of when read in the context in which they were made, fail to satisfactorily establish a perjury on the part of the witness on the trial."

In this appeal, Romeo argues that the prosecutor's failure to make explicit disclosure at the trial of a promise of assistance for Gramando's wife violated his right to due process of the law. He relies upon such cases as Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967), Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and United States ex rel. Meers v. Wilkins, 326 F.2d 135 (2 Cir. 1964), which concern suppression of highly material evidence by the prosecution as the result of a calculated decision to obstruct justice or an intentional concealment of evidence obviously of great value to the defendant. The appellant also relies upon such cases as Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, which decide "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"; and United States v. Keogh, 391 F.2d 138, 146–147 (2 Cir. 1968), in which

5. See note 4, *supra.*

6. 273 App.Div. 891, 78 N.Y.S.2d 563 (1st Dept.1948).

7. 27 Misc.2d 772, 210 N.Y.S.2d 431 (Ct. Gen.Sess.N.Y.Co.1961).

8. 16 A.D.2d 240, 226 N.Y.S.2d 957 (1st Dept.1962)

9. 12 N.Y.2d 751, 234 N.Y.S.2d 224 (1962).

10. 373 U.S. 952, 83 S.Ct. 1682, 10 L.Ed.2d 707 (1963).

Judge Friendly discussed the above mentioned kinds of cases and also noted a third kindred sort in which there has been no such deliberate suppression and no such request, but "hindsight discloses that the defense could have put the evidence to not insignificant use. While we do not dispute that relief may sometimes be granted even in such cases, the standard of materiality must be considerably higher." 391 F.2d 147.

The facts of the present case are not at all comparable to the knowing and intentional suppression and deceit which underlies the holding in *Napue*; nor is there anything to show that there was material evidence favorable to the accused which, though requested by the defense, the prosecution refused to disclose as in Brady v. Maryland. While the prosecution sought to keep the consideration which Gramando was to receive in the form of having the charge against his wife dismissed, separate and distinct from the defense allegation of considerations of promises of leniency relating to Gramando's own pending murder indictments, which the prosecution denied, defense counsel immediately injected every reference to the leniency already shown to the wife with claims that there had been promises of future leniency for Gramando himself in the murder cases. But the record is barren of any evidence that such promises to Gramando had ever been made, or, in fact, that he had ever sought promises of leniency for himself.

We also conclude that the facts of this case do not bring it within the third category discussed in *Keogh* which concerned inadvertent failure to disclose evidence which hindsight reveals the defendant could have put to helpful use, because the record does not show there was any such evidence. The failure fully to bring out to the jury the exact terms of the bargain from which Gramando's wife benefited was not an instance of suppression at all, but was exactly what defense counsel desired; and it is obvious that he sought to put any ambiguity to a significant use.

What the appellant calls deliberate suppression here amounts to no more than speculation on refinements of the disclosure that was made. After all, the essential fact that Gramando made a bargain with the prosecutor which resulted in the solution of the Rubin case and which brought about the dismissal of the charge against Mrs. Gramando was told to the jury. Every precise detail of the bargain may or may not have been clearly delineated in the testimony, but its essence was fully disclosed. Whether Gramando's part of the bargain implicitly included a willingness on his part to testify against Romeo was not investigated. Gramando said the District Attorney did not promise him anything for testifying, and there is nothing to show that he did. All that remains is a possible implication that Gramando's promise to give information about the Rubin case may have carried with it the suggestion that he would also testify. It was up to the jury to draw or refuse to draw such an inference. Whether Gramando had any other motive does not appear, but there is no evidence that the prosecution knew of any. These things would normally be probed into on cross-examination, but that was not done in this case.

The appellant complains that the prosecution was not sufficiently explicit in stating that it had promised to help get Mrs. Gramando released from the charge against her, but it defies imagination to conceive of anything else the jury could have believed, under the circumstances. We conclude that this is not a case of suppression within the scope of the cases above discussed, and we find no error in the District Court's conclusion that any lingering confusion over the sequence of events concerning Gramando's wife "could not have affected the jury's appraisal of Gramando's credibility." Cf. United States ex rel. Catanzaro v. Mancusi, 404 F.2d 296, 300 (2 Cir. 1968).

Affirmed.

FRIENDLY, Circuit Judge (concurring):

This is an exceedingly close case. I agree that Gramando's denials of having been made any promises *for testifying*, as distinguished from revealing information about the Rubin murder, were not shown to have been literally false, and that responsibility for failing to develop what now turns out to have been the full story with respect to the dismissal of the gun charge against Mrs. Gramando lay primarily with defense counsel who was mainly interested in attempting to show promises as yet unperformed, particularly in relation to the two murder charges against Gramando. I am also willing to accept the interpretation of the prosecutor's denial of "promises" that was made by the judge who heard the *coram nobis* application, People v. Romeo, 27 Misc.2d 772, 777, 210 N.Y.S.2d 431, 437 (Ct.Gen.Sess. N.Y.Co.1961), and was adopted by Mr. Justice Valente dissenting in the Appellate Division, 16 A.D.2d 240, 246–247, 226 N.Y.S.2d 957, 963–964 (1st Dep't 1962), namely, that this related to promises in relation to the pending murder indictments against Gramando. Furthermore as Judge Anderson points out, we can never know whether the prosecutor would not have revealed the executed promise with respect to Mrs. Gramando if defense counsel had not twice interrupted him. This leaves only the prosecutor's correct but incomplete statement in summation that "the Grand Jury, not the District Attorney, voted no bill" against Mrs. Gramando.

If this were an appeal from denial of a motion for a new trial after a federal conviction, I might well favor reversal because of the prosecutor's failure to come completely clean and the consequent hazard that the jury could have thought he had made no promise at all to have the gun charge against Mrs. Gramando dismissed, even though they knew that Gramando had asked for help about this and that the charge had been dismissed after Gramando talked but before he testified. Under such circumstances the danger, even a slight one, that a possibly innocent man might be wrongly imprisoned for life would outweigh the cost and delay incident to a new trial in which the jury would have the full story. See United States v. Miller, 411 F.2d 825 (2 Cir. 1969). But this case comes to us twenty-three years after a state court trial, and issuance of the writ would be equivalent to an order for the release of a defendant there convicted of murder on sufficient although surely not overwhelming evidence. Moreover, the facts with respect to the alleged prosecutorial misconduct have been painstakingly reviewed by a General Sessions judge, the Appellate Division for the First Department, and the Court of Appeals which unanimously sustained the Appellate Division dissenters, 12 N.Y.2d 751, 234 N.Y.S.2d 224 (1962), as well as by a federal district judge. The New York and the federal legal standards on the subject here at issue are in no way at odds; indeed Judge Fuld's opinion in People v. Savvides, 1 N.Y.2d 554, 154 N.Y.S.2d 885 (1956), was the path-breaker on which the Supreme Court relied in Napue v. Illinois, 360 U.S. 264, 269–270, 79 S.Ct. 1173 (1959). Any difference between us and the New York courts would thus be in appraising just how far the prosecutor departed from what are now considered the governing standards and what impact this could have had upon the jury. I have no such sense of infallibility as to set any views of mine against a unanimous Court of Appeals under the circumstances presented here. Whether Romeo might be a worthy candidate for relief of a different sort is not for us to say.