[No. 332-3.   Division Three.   March 29, 1972.]

THE STATE OF WASHINGTON, *Respondent*, v. MICHAEL O'DENNIS FINNEGAN, *Appellant*.

*Howard K. Michaelsen* and *Francis J. Conklin,* for appellant (appointed counsel for appeal).

*James P. McNally, Prosecuting Attorney,* and *D. Roger Reed, Assistant Attorney General,* for respondent.

MUNSON, C.J.—Defendant Michael O'Dennis Finnegan appeals his conviction for first-degree murder. The death penalty was not recommended.

On November 23, 1967, August Nelson was found shot to death in Pend Oreille County, Washington. Approximately 2 years later, defendant and Monte Duncan were arrested and charged in separate informations with Nelson's homicide. While in custody of the Pend Oreille County authorities, Duncan confessed to his participation in the killing of Nelson and implicated defendant.

Defendant moved for pretrial discovery, including Duncan's statement. The resident judge of Pend Oreille County orally granted that part of the motion with respect to Duncan's statement. The state moved for reconsideration. Subsequent thereto the resident judge became ill and a visiting judge was assigned to the case. Upon the latter's reconsideration, the motion was denied in its entirety; however, the state was ordered to make Duncan available for questioning by defendant. Duncan's attorneys were so notified. Duncan was made available but, on the advice of his coun-

sel, refused to discuss any aspect of the case. Defendant's trial commenced June 22, 1970.

The state established: The homicide of Nelson; the circumstances under which his body was found; the cause of his death; Duncan, Nelson and defendant were together in a Spokane tavern the night of Nelson's disappearance; the three were seen getting into defendant's car; defendant had access to a weapon the caliber of that used to kill Nelson; and defendant had made a statement to a third person, upon his return to a Spokane tavern, that he, the defendant, had "plugged him [Nelson] full of holes."

During the course of trial the state granted Duncan immunity from all prosecution relative to Nelson's death and called him as a witness. The pertinent portions of his testimony may be summarized as follows: Defendant previously told Duncan he was going to kill Nelson; the three men got into Finnegan's car late November 22, 1967 and proceeded north from Spokane on the pretense of going to Pend Oreille County to commit a robbery; after driving over an hour, defendant pulled into a side road and stopped his car; defendant and Nelson left the car and went to its trunk to change clothes for the "robbery"; while Duncan was approaching the rear of the car he heard a shot and saw Nelson slump towards the ground, whereupon Finnegan shot him again; the deceased fell to the ground; upon Duncan's request, Finnegan handed Duncan the gun and Duncan fired a shot into Nelson's head but at that time Duncan believed Nelson was already dead; thereafter defendant and Duncan returned to Spokane to frequent several bars and ostensibly establish their whereabouts.

Defense counsel vigorously cross-examined Duncan on all aspects of his testimony, his background, his understanding of the meaning of his immunity, and its effect as to his prosecution.[1]

---

[1]Defense counsel's cross-examination of the state's witnesses was extensive, covering not only their testimony but also attempting to establish alleged police pressure and its effect, if any, on their testimony.

Finnegan's defense consisted primarily of an alibi that: (1) he did not participate in the killing—he was in Spokane the night in question but Duncan had the use of his car that evening; and (2) he left for Seattle early the following morning, November 23, 1967, with Duncan and two female companions.

In rebuttal the state offered testimonial and photographic evidence placing Duncan in Spokane until Thursday evening, November 23, 1967.

The presentation of evidence concluded late Friday afternoon, June 26, 1970; whereupon counsel and court began their instruction conference. During the conference defense counsel learned for the first time, from an unidentified informer, that Monte Duncan, while confined in the Pend Oreille County jail,[2] "attempted" to take his life on two occasions: (1) by taking an overdose of sleeping pills March 13, 1970, and (2) by slashing his neck June 5, 1970. After checking the veracity of the information with the prosecution, defense counsel advised the court it was his opinion the case should be reopened and the jury advised of these facts. However, the court said the matter could be taken up on a motion for new trial if an adverse verdict was rendered. Defense counsel apparently acquiesced in the court's informal decision and proceeded with the instruction conference. No motions were made on the record, but the state confirms the conversation as set forth above. The jury was instructed that evening. A guilty verdict was returned Saturday, June 27, 1970. On Monday, June 29, 1970, Duncan hung himself while in the protective custody of the Pend Oreille County Sheriff.

Defendant's motion for new trial was denied. The court found the evidence of Duncan's suicide attempts, as well as additional evidence corroborating the alibi, would not have changed the jury verdict and that the cross-examination of

---

[2] Defendant was confined in the Spokane County jail pending trial, at his request, inasmuch as his retained counsel practiced in that community. Duncan's court-appointed counsel practiced in Pend Oreille County.

Duncan by defense counsel clearly established Duncan's competency.

The primary issues before us are: (1) whether the prosecutor had a duty to inform defense counsel of Duncan's suicide attempts prior to offering Duncan's testimony, which we answer in the affirmative; and (2) whether the prosecutor's failure to do so constituted reversible error, which we answer in the negative.

The prosecutor's duty to disclose evidence favorable to a defendant began with *Mooney v. Holohan*, 294 U.S. 103, 79 L. Ed. 791, 55 S. Ct. 340, 98 A.L.R. 406 (1935) wherein the Supreme Court held it was reversible error for the prosecution to suborn perjury to seek a conviction. *Alcorta v. Texas*, 355 U.S. 28, 2 L. Ed. 2d 9, 78 S. Ct. 103 (1957) extended the *Mooney* doctrine to the prosecutor's use of evidence known to be false. The prosecutor's duty not to suborn perjury or to use evidence known to be false was further enlarged to place upon the prosecutor an affirmative duty to correct state witnesses who testify falsely. *Napue v. Illinois*, 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959). The rationale of the cases cited, and the myriad ones relying thereon, casts the duty of the prosecutor to disclose primarily in terms of the prosecutor's misconduct since the use of perjured or false testimony severely undermined the stature of the judicial system. *Miller v. Pate*, 386 U.S. 1, 17 L. Ed. 2d 690, 87 S. Ct. 785 (1967). However, as early as *United States ex rel. Thompson v. Dye*, 221 F.2d 763 (3d Cir. 1955), a rephrasing of this rationale began to be enunciated, *i.e.*, the impropriety of the suppression of evidence was being viewed in terms of the harm suffered by defendants as opposed to prosecutorial misconduct. The culmination of this rephrasing is found in *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963)[3]

---

[3]"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963).

when the Supreme Court did away with the bad faith aspect of the prosecutor's misconduct. Thus, as observed by Justice Traynor in *Ground Lost and Found in Criminal Discovery,* 39 N.Y.U. L. Rev. 228 (1964), the prosecutor's constitutional duty to reveal evidence material to either the guilt or punishment of a defendant was firmly established; however, no formula for the implementation of this duty was established. In the most recent Supreme Court case considering this issue, *Giles v. Maryland,* 386 U.S. 66, 17 L. Ed. 2d 737, 87 S. Ct. 793 (1967), the court refused the challenge of the *Brady* decision. Although the court phrased the question before it as "whether the prosecutor's constitutional duty to disclose extends to all evidence admissible and useful to the defense", the majority bypassed this question by using the rationale of *Napue v. Illinois, supra,* to serve as the basis for its remand. Our latest case on this issue, *State v. Temple,* 5 Wn. App. 1, 485 P.2d 93 (1971), adopts the *Brady* approach.

█ Discovery, however, when requested by a defendant, is subject to the trial court's discretion. There must exist some reasonable basis for the request. *State v. Thompson,* 54 Wn.2d 100, 338 P.2d 319 (1959). In the case at bar, where those accused of this crime were lodged in separate county jails and their attorneys were residents of different cities, approximately 50 miles apart, there was no reason for the defendant or his attorney to suspect such conduct on the part of Duncan. From our analysis of the previous cases, and our understanding of the rationale inherent therein, we believe in this case there was evidence (a) favorable to the accused and material to either negate guilt or mitigate the degree of the offense or punishment, (b) known to the state, (c) that may have an effect on the outcome of the trial, (d) which the state had reason to believe was unknown to the defendant. Disclosure by the prosecutor should have been made at the earliest feasible opportunity. *Brady v. Maryland, supra;* ABA Standards, The Prosecution Function and the Defense Function, § 3.11 (Approved Draft, 1971); *cf.* Illinois Supreme Court Rules,

618

article 4, Rules on Criminal Proceedings in the Trial Court, Rule 412.

■ Since (a) defendant and Duncan were charged by separate informations, (b) were to be tried separately, and (c) during the time leading up to the trial of defendant the state did not contemplate calling Duncan as a witness, there was no pretrial duty on the prosecutor to notify defendant or his counsel of the incidents involving Duncan. However, when the state's offer of immunity to Duncan in exchange for his testimony was accepted, the duty to disclose arose. At that instant the attempted suicides became relevant to the credibility or competency of Duncan and thus bore upon defendant's guilt and/or punishment.[4] The failure of defense counsel to request such disclosure is immaterial. *United States v. Poole*, 379 F.2d 645 (7th Cir. 1967); *United States ex rel. Meers v. Wilkins*, 326 F.2d 135 (2d Cir. 1964); *Barbee v. Warden, Maryland Penitentiary*, 331 F.2d 842 (4th Cir. 1964); *Levin v. Katzenbach*, 363 F.2d 287 (D.C. Cir. 1966); *cf. In re Ferguson*, 5 Cal. 3d 525, 487 P.2d 1234, 96 Cal. Rptr. 594 (1971); Illinois Supreme Court Rules, *supra*. Although we appreciate the prosecutor did not so understand his duty to disclose, that does not alter the duty.[5]

---

[4]Discovery is not necessarily always in favor of the defendant. *Williams v. Florida*, 399 U.S. 78, 26 L. Ed. 2d 446, 90 S. Ct. 1893 (1970). Criminal rules of discovery are presently being contemplated in this state, *i.e.*, Washington Proposed Rules of Criminal Procedure, § 4.7 and *comments*; ABA Standards, Discovery and Procedure Before Trial (Approved Draft, 1970); ABA Standards, The Prosecution Function and the Defense Function, *supra*; which will be available to both parties. See also Comment, *Five Years Under State v. Thompson Criminal Pretrial Discovery in Washington*, 39 Wash. L. Rev. 853 (1964); Revelle and Ashbaugh, *Criminal Pre-trial Discovery—A Proposal*, 3 Gonz. L. Rev. 48 (1968) and Washington cases cited therein; Illinois Supreme Court Rules, *supra*, Rule 413; Florida Rules of Criminal Procedure.

[5]Arguably, if Duncan had been on trial, the "attempted suicides" could have been shown by the prosecutor in its case in chief. *State v. Campbell*, 146 Mont. 251, 405 P.2d 978, 984-85 (1965); *State v. Plunkett*, 62 Nev. 258, 265, 142 P.2d 893, 149 P.2d 101 (1943-44); 22A C.J.S. *Criminal Law* § 630 at 478 (1961); 1 F. Wharton, Criminal Evidence § 210 at 418 (12th ed. R. Anderson 1955); 2 Wigmore on Evidence § 276(f) at 118 (3d ed. 1940).

We must now determine whether the withholding of this information denied defendant a fair trial or amounted to harmless error.

The primary interest in this area is not to punish misconduct of the prosecutor,[6] but to insure a fair trial to a defendant. In particular, it is to insure that a trial will bring forth, not hide, the truth. *United States v. Bryant,* 439 F.2d 642 (D.C. Cir. 1971).[7] The failure of the prosecutor to disclose, however, does not necessarily warrant automatic reversal. As observed by Judge Friendly in *Kyle v. United States,* 297 F.2d 507, 514 (2d Cir. 1961):

> [T]he standard of how serious the probable effect of an act or omission at a criminal trial must be in order to obtain the reversal or, where other requirements are met, the vacating of a sentence, is in some degree a function of the gravity of the act or omission; the strictness of the application of the harmless error standard seems somewhat to vary, and its reciprocal, the required showing of prejudice, to vary inversely, with the degree to which the conduct of the trial has violated basic concepts of fair play. At one end of the range is the case where the defendant has simply, although excusably, not had the benefit of evidence that has later become available to him; there the Berry test [*Berry v. State,* 10 Ga. 511 (1851)] requires a showing that the new evidence "would probably produce a different verdict." At the other end of the range is the case of a defendant being obliged to plead to a capital charge without benefit of counsel; there the court "does not stop to inquire whether prejudice resulted." Hamilton v. State of Alabama, 82 S.Ct. 157, 159 (1961).

[6]It has long been established prosecuting attorneys of this state are quasi-judicial officers and have the duty to see that one accused of a crime is given a fair trial. *State v. Gibson,* 75 Wn.2d 174, 449 P.2d 692 (1969); *State v. Huson,* 73 Wn.2d 660, 440 P.2d 192 (1968); CPE 5 and CPR DR 7-103(B); see also *Berger v. United States,* 295 U.S. 78, 79 L. Ed. 1314, 55 S. Ct. 629 (1935).

[7]As stated by Justice Fortas in his concurring opinion in *Giles v. Maryland,* 386 U.S. 66, 102, 17 L. Ed. 2d 737, 760-61, 87 S. Ct. 793 (1967): "I see no reason to make the result turn on the adventitious circumstance of a request. If the defense does not know of the existence of the evidence, it may not be able to request its production. A murder trial—indeed any criminal proceeding—is not a sporting event."

As further observed by Judge Friendly in *United States v. Keogh,* 391 F.2d 138, 148 (2d Cir. 1968):

Deliberate prosecutorial misconduct is presumably infrequent; to invalidate convictions in the few cases where this is proved, even on a fairly low showing of materiality, will have a relatively small impact on the desired finality of judgments and will deter conduct undermining the integrity of the judicial system. The request cases also stand on a special footing; the prosecution knows of the defense's interest and, if it has failed to honor this even in good faith, it has only itself to blame. Failure to appreciate the use to which the defense could place evidence in the prosecution's hands, or forgetfulness that it exists when a development in the trial has given it a new importance, are quite different. Since this must happen to the most scrupulous prosecutors and the issue of deterrence scarcely arises, the problems of the courts and the wider interests of society unite to require a substantially higher probability that disclosure of the evidence to the defense would have altered the result. To invalidate convictions in such cases because a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict would create unbearable burdens and uncertainties.

Thus, when the prosecutor's failure to disclose may have had an effect upon the outcome of the trial, reversal is warranted. *Clarke v. Burke,* 440 F.2d 853 (7th Cir. 1971); *Rhinehart v. Rhay,* 440 F.2d 718 (9th Cir. 1971); *United States v. Bonanno,* 430 F.2d 1060 (2d Cir. 1970); *United States ex rel. Romeo v. McMann,* 418 F.2d 860 (2d Cir. 1969); *United States ex rel. Fein v. Deegan,* 410 F.2d 13 (2d Cir. 1969); *Luna v. Beto,* 395 F.2d 35 (5th Cir. 1968).[8] See also Traynor, *Ground Lost and Found in Criminal Discovery,* 39 N.Y.U. L. Rev. 228 (1964); *The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant,* 74 Yale

---

[8]Cases which would also reverse for failure to disclose matters affecting defendant's pretrial preparation or the development of defense theories are *United States ex rel. Butler v. Maroney,* 319 F.2d 622 (3d Cir. 1963); *Ashley v. Texas,* 319 F.2d 80 (5th Cir. 1963); *United States ex rel. Meers v. Wilkins, supra.*

L. J. 136, 145-48 (1964); *Withholding or Suppression of Evidence by Prosecution in Criminal Case as Vitiating Conviction,* Annot., 34 A.L.R.3d 16 (1970).

This brings us to a discussion of the harmless error rule as enunciated in *Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) and *Harrington v. California,* 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726 (1969).

In *Chapman* the court stated at page 24:

[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. While appellate courts do not ordinarily have the original task of applying such a test, it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard, . . .

(Footnote omitted.)

Justice Brennan, dissenting, in *Harrington,* accused the majority of overruling *Chapman* and adopting a rule that "the trial of a criminal offense may be held harmless if there is 'overwhelming' untainted evidence to support the conviction." But the majority stated: "We do not depart from *Chapman;* nor do we dilute it by inference. We reaffirm it."

While *Chapman* and *Harrington,* and subsequent cases, usually involve the *admission* of illegal evidence, this case involves the omission of valid evidence.[9] The test should remain the same.

In *State v. Macon,* 57 N.J. 325, 273 A.2d 1 (1971), Weintraub, C.J. states at pages 335-40:

No matter how a test may be stated, the question whether an error is reason for reversal depends finally upon some degree of possibility that it led to an unjust verdict. . . . Defendants fare better if a new trial may be ordered upon a "possibility" of injustice. Still, not "any" possibility can be enough for a rerun of the trial. The possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.

. . .

---

[9]See footnote 5, *supra.*

Stated affirmatively, the proposition is that a new trial shall be ordered if there is a reasonable doubt as to whether the constitutional error contributed to the verdict. It seems to us that this is the way judges have always approached the subject of "harmless" error, whatever the verbal framework within which the subject has been cast. A judge would hardly insist an error, "constitutional" or other, was "harmless" if he found a "reasonable" doubt as to whether the error contributed to the result. What continues to defy articulation is the process which leads a judge to say there is a doubt and that the doubt is or is not a reasonable one. The circumstances are too infinite and the appellate judgment too laden with discretion to admit of formulary aid.

We are unable to find a distinction in the rule as expressed by Weintraub, C.J. and our Supreme Court in reaffirming its statement in *State v. Martin,* 73 Wn.2d 616, 627, 440 P.2d 429 (1968) when it stated in *State v. Mack,* 80 Wn.2d 19, 21-22, 490 P.2d 1303 (1971): [10]

A prejudicial error may be defined as one which affects or presumptively affects the final results of the trial. *State v. Britton,* [27 Wn.2d 336, 178 P.2d 341 (1947)]. When the appellate court is unable to say from the record before it whether the defendant would or would not have been convicted but for the error committed in the trial court, then the error may not be deemed harmless, and the defendant's right to a fair trial requires that the verdict be set aside and that he be granted a new trial. But, where the defendant's guilt is conclusively proven by competent evidence, and no other rational conclusion can be reached except that the defendant is guilty as charged, then the conviction should not be set aside because of unsubstantial errors.

Considering the facts of the instant case, in view of these principles, the previous summary of the state's evidence presented a prima facie case through circumstantial evidence. Further, the testimony of one witness who heard

---

[10]*Cf.* application of *Chapman* and *Martin* in *State v. Estill,* 80 Wn.2d 196, 492 P.2d 1037 (1972).

defendant admit to the killing of Nelson made the state's case stronger.[11]

Duncan's testimony, as summarily set forth herein, if believed, was surely an aid to the prosecutor's case against defendant. What benefit would the defendant have derived from prior knowledge of the suicide attempts?

(a) Defendant contends had he known of the two attempts he would have requested a psychiatric examination of Duncan and presumably challenged the competency of the witness. We give little weight, however, to this argument. Whether or not he was competent at the time he made the attempts, it does not necessarily follow that he was incompetent at the time of the trial. Assume, arguendo, he was given a psychiatric examination. Duncan testified extensively during the trial, was before the court for a considerable period of time, and not one doubt was raised then as to his competency. His competency at the time of trial is not particularly challenged on this appeal. We believe, however, his appearance and concomitant testimony were the best evidence of his competency at the time he testified. *State v. Bishop*, 51 Wn.2d 884, 322 P.2d 883 (1958).

(b) The attempts were a circumstance which the jury could have taken into consideration as evidence of the wit-

---

[11]"Q Did you see Augie Nelson anymore? A No. Q After they left in the car, these three people, you stayed on in the tavern, did you? A Yes. . . . Q And you know, you can tell us in all truthfulness and factualness that you can remember Mike Finnegan and Monte Duncan coming back later in the evening to the same place? A Yes, I can. Q And was anything said by them to anyone that you heard, or not? A Well, somebody had asked where Augie Nelson was and Mike had made the statement that he shot him full of holes. Q Did you hear this statement? A I was standing there with another girl. . . . Q Now, you mentioned that you overheard Mike say he plugged Augie Nelson full of holes? A Yes. Q When was that again, please? A Well, it was after they got rid of Augie Nelson. Q Was it the night of the 22nd? A Well, yes, it was the day before Thanksgiving. . . . Q And this is what you overhead? A I was standing right there, I heard it come out, I can't overhear, you know, I was there, it wasn't hearsay. Q You remember this very clear? A I remember it very clear."

ness' guilt as contrasted to that of defendant. As to Duncan's guilt, he admitted his complicity in this affair; he testified that he was aware of defendant's threat to kill Nelson; he knew the trip into Pend Oreille County was a ploy; he admitted he shot Nelson once, although he believed Nelson was dead at the time. There is no question presented by this record of Duncan's culpability and complicity in this homicide. An examination would not disprove this testimony.

(c) He further admitted the state had granted him immunity from all prosecution in relation to Nelson's death and was extensively cross-examined on that point. Likewise, evidence of these attempts could have been utilized by the defendant to impeach the credibility of Duncan. However, his credibility had been extensively questioned through evidence of the granting of the immunity, alleged police pressure utilized in obtaining his original statement and testimony, as well as that of other witnesses, and extensive cross-examination into his background and conduct. There can be no doubt that Duncan's credibility was in issue, even without this evidence.

After extensive review of the entire record, we can positively state our belief, beyond a reasonable doubt, that had this information been presented to the jury, the verdict would have been the same. The trial court did not err in denying defendant's posttrial motions.

The other assignments of error may be discussed summarily.

■ Defendant challenges the authority of the visiting judge to change the resident judge's oral decision. Since the decision had not reached the status of an order, it was subject to reconsideration and change. No error was committed. *Chandler v. Doran Co.*, 44 Wn.2d 396, 267 P.2d 907 (1954); *Felsman v. Kessler*, 2 Wn. App. 493, 498, 468 P.2d 691 (1970).

■ Defendant contends Duncan's testimony should have been excluded because he was not advised of his rights as required by *Miranda v. Arizona*, 384 U.S. 436, 16

L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). We disagree. These are rights personal to Duncan; defendant has no standing to challenge a violation, if in fact there was such a violation.

■ Defendant alleges an abuse of the trial court's discretion in allowing into evidence testimony regarding defendant's accessibility to a gun of the caliber used to kill Nelson. We disagree. *State v. Iddings,* 5 Wn. App. 99, 101, 485 P.2d 631 (1971). The relevancy of evidence lies within the discretion of the trial court. *State v. Cerny,* 78 Wn.2d 845, 848-49, 480 P.2d 199 (1971); *State v. Schrager,* 74 Wn.2d 75, 79-80, 442 P.2d 1004 (1968); *Chase v. Beard,* 55 Wn.2d 58, 61, 346 P.2d 315 (1959). We find no abuse of the trial court's discretion under this assignment of error.

■ Defendant contends that rebuttal witnesses were not named on the state's list of witnesses and the testimony elicited therefrom should not have been accepted. Rebuttal witnesses need not be listed. *State v. Stambach,* 76 Wn.2d 298, 456 P.2d 362 (1969).

■ Defendant challenges the admission of a photograph, ostensibly taken on Thanksgiving Day in the city of Spokane, on which the testimony of two witnesses identifies Duncan as one of the people in the photograph. The admission of a properly identified photograph lies within the sound discretion of the trial court. We find no abuse of that discretion. *State v. Boggs,* 33 Wn.2d 921, 207 P.2d 743 (1949).

■ Lastly, defendant assigns error to the use of the word "infer" in instruction No. 10:

The law presumes that every man intends the natural and probably consequences of his own acts. Where it takes a particular intent to constitute a crime that intent must be proved to the satisfaction of the jury. It does not require direct or positive proof but the circumstances must be such as would authorize the jury to *infer* the intent with which the act was done.

(Italics ours.) "Infer" means to derive a conclusion from facts or premises. So long as there is a factual basis from

which an inference can be drawn, the trier of fact can reach that inference. *State v. Ternan,* 32 Wn.2d 584, 203 P.2d 342 (1949); *State v. Iddings, supra* at 102. The instant record is replete with a sufficient factual basis from which the requisite intent could be inferred. Consequently, we find no error.

Judgment affirmed.

GREEN and EVANS, JJ., concur.

Petition for rehearing denied May 24, 1972.

Review denied by Supreme Court July 25, 1972.