

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34578-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SHAWN SAMUEL PARKER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Shawn Parker appeals his convictions for first degree possession

of stolen property and first degree trafficking in stolen property, as well as an order that

he pay restitution of $43,000.70. He argues that trial testimony of the investigating

officer, which the State concedes was inconsistent, presents the rare case where we can

invalidate a search warrant challenged for the first time on appeal or set aside the verdict

for the State's knowing use of perjury. We are not persuaded. We affirm the convictions

and the restitution order.

FACTS AND PROCEDURAL BACKGROUND

Sometime overnight on November 5 or 6, 2014, a trailer filled with over $100,000

of snowmobile gear, clothing and accessories was stolen from the property of an Issaquah

retailer, I-90 Motorsports (I-90). Employees had loaded the trailer with merchandise to

sell at a "snow show" in Spokane, Washington.  After-hours security footage revealed a silver truck backing in, hooking up the trailer, and driving away.  The trailer was found a few days later, near Snoqualmie Pass, emptied of the merchandise.

Investigation into the burglary was assigned to Detective Brian Horn of the Issaquah Police Department.  Employees of I-90 undertook preparation of an inventory of the stolen merchandise for insurance and investigation purposes, and provided it to police.

Within days of the burglary, I-90's owner, Richard Wolf, saw what he believed to be the truck that drove off with the store's trailer.  He stopped to photograph it and its license plate.  As he did, Shawn Parker, whom Mr. Wolf knew from business dealings many years earlier, approached the truck with two other men.  Mr. Parker owned a snowmobile rental operation, Cascade Playtime, which also sold snowmobile clothing, accessories, and equipment.  Mr. Wolf's and Mr. Parker's business relationship had ended badly in or about 2006.

Detective Horn became aware early in the investigation that Mr. Wolf and his manager, Remko Oosterhof, suspected Mr. Parker of being involved in the burglary.  Issaquah police followed up on Mr. Wolf's photographs of the silver truck but it proved not to belong to Mr. Parker.

Sometime before Christmas, Mr. Oosterhof spoke with two I-90 customers about how they might determine if Mr. Parker was involved in the burglary. Among merchandise stolen from I-90 were ABS[1] avalanche airbag packs, which retail for $1,200 and bear a serial number. If an ABS pack sold by Cascade Playtime bore the serial number of a pack that had been in I-90's trailer, Mr. Parker or his staff would be implicated. The two customers, Arthur Aske and Andrew Hassard, agreed to visit Cascade Playtime and, if it had ABS brand packs, buy one. They visited Cascade Playtime, which did have ABS packs, and they purchased one. Its serial number was that of a pack stolen from I-90. When this was reported to Detective Horn, he obtained a warrant to search Cascade Playtime for the type of merchandise stolen from I-90.

Law enforcement executed the search warrant in early January 2015. They found merchandise that appeared to have I-90's price tag removed or an orange price sticker placed over I-90's price tag. Officers seized $41,000 in value of Cascade Playtime's merchandise during the search.

Mr. Parker was charged in January 2015 with first degree possession of stolen property and first degree trafficking in stolen property.

---

[1] In the report of proceedings, the brand name is reported as AVS, but the inventory and insurance records indicate that the correct brand name is ABS. *See, e.g.*, Ex. 521; Clerk's Papers at 168-69; *see also* https://abs-airbag.com/us/ [https://perma.cc/672J-MXXB].

At a status hearing in May 2015, an attorney standing in for Mr. Parker's retained counsel asked the court to move the trial date to August 2015 to accommodate retained counsel's schedule. He told the court, "I think that we're going to challenge the warrant in this case." Report of Proceedings (RP) at 5-6.

Ultimately, the case did not proceed to trial until April 2016. Nothing in our record indicates the warrant was ever challenged or that any other suppression motion was brought. The State obtained leave to amend the information twice before trial, adding the aggravating circumstance that each count was a major economic offense or series of offenses in October 2015, and adding charges for second degree burglary, first degree theft, theft with the intent to resell, and organized retail theft in December 2015.

When the case finally proceeded to trial, one of the first witnesses called by the State was Detective Horn. By the time of trial, he had moved to Phoenix, Arizona, and was working in the private sector. He testified to his involvement in the foregoing matters. Most importantly for purposes of this appeal, he testified that when he was notified of the results of the self-help investigation by Messrs. Oosterhof, Aske, and Hassard, he was sent a photograph of the stolen and recovered ABS pack, and they also brought the physical pack in for him to see. He identified exhibit 21 as the photograph he was provided of the stolen and recovered ABS pack and identified exhibit 126 as the pack he was shown.

4

Mr. Parker emphasizes the following portion of the direct examination, which

begins with the detective's account of learning about the self-help investigation:

A.     . . . [T]hey were sent out to buy one of these and they were
       investigate [sic], talking to and buying one of these avalanche packs,
       which was then purchased for cash at the business Cascade Playtime.
            They brought it back and I was immediately sent photos from
       the business and then they came in, in person to show me the
       backpack with the serial number that matched the lost list that they
       already obtained from the business.

Q.     So in terms of viewing the backpack, it was brought into you when it
       was provided back to the business (inaudible)?

A.     Correct.

Q.     And do you recognize that item?  Is it present in court today?

A.     It is.  You are holding the item.

Q.     And that would be item, No. 126.

A.     Okay.

Q.     And in terms of the photographs, did you take those or did the
       business take those?

A.     The business took them and sent them to me.  They were excited,
       because they had the actual serial number which then matched the
       list I already had.

. . . .

Q.     [By the prosecutor]:  You received information related to the
       purchase of the backpack.  You had the opportunity to view the
       backpack yourself.  You had the opportunity to compare the serial
       number with the lost list from I-90 Motorsports.  At the conclusion
       of that what was your next step in the investigation?

A.     Based on information I now had and my understanding of probable
       cause for possession of stolen property at the business Cascade
       Playtime and to include the criminal activity of selling, trafficking
       and selling property by Mr. Parker.  So I drafted a search warrant, I

went to the King County Superior Courthouse, being that we are in a different jurisdiction I had to go to the Superior Court house. Presented my probable cause statement to Judge [Ruhl] and had a search warrant issued for the business, and an arrest warrant issued for Mr. Parker.

RP at 73-76.

After discussing the steps taken to execute the search warrant, the State asked Detective Horn about what was depicted in exhibit 21. Detective Horn described exhibit 21 as the picture he received with "a serialized serial number of the backpack that was purchased" at Mr. Parker's business. RP at 78. His identification of exhibit 21 was touched upon again in cross-examination:

Q. Remind me again, what is this a picture of?

A. This is a picture that was sent to us of a backpack purchased by the witnesses. That have a serial number purchased from Mr. Parker that has a serial number that matches what was purported as taken.

Q. Okay. And when did you receive this picture?

A. I do not recall the exact date. It would have been before 28th of December.

[Court interjects to ask which exhibit they are discussing]

Q. (By Mr. Kirkham) Exhibit 21 is what you are referring to as the picture that you received via text, e-mail, however—

A. Uh-huh.

Q. —of the backpack they had bought from Mr. Parker, correct?

A. Yes, sir.

Q. Okay. So they sent it to you and said, Hey, we just bought this from Mr. Parker, correct?

A. Uh-huh.

RP at 128-29.

Later on in the State's case, it called as witnesses Mr. Aske, Mr. Hassard, and Mr. Oosterhof. None of them testified that he provided Detective Horn with a photograph of the stolen and recovered pack or that he took it to the detective so he could see it for himself.

Mr. Oosterhof testified that exhibit 21 was *not* a picture of the stolen and recovered pack. He testified it was a picture of an ABS pack from I-90's inventory that he sent to Mr. Aske and Mr. Hassard after they purchased the backpack from Mr. Parker's business. It was provided to show them where they would find the serial number.

After the State rested, Mr. Parker testified in his own defense. The defense then called Detective Horn. During his redirect examination of the detective, defense counsel elicited testimony inconsistent with some of the detective's testimony in the State's case. Mr. Parker emphasizes the following testimony:

> Q. Okay. Now, the backpack that you ultimately—I believe testified that you got, you booked it into evidence; is that correct?
> A. No, sir.
> Q. When you first testified, you didn't testify to that?
> A. That the backpack was booked into evidence? No, sir.
> Q. Okay. Did you book anything into evidence?
> A. No, sir.
> Q. So there were no items booked?

A.    No, they were returned to the business.

Q.    Okay.  And the photograph that you received, that backpack that hasn't been admitted, do you know where that's at?

A.    Of this?  The backpack that's in court?

Q.    Correct.

A.    Correct.  No photograph has been taken.

Q.    Okay.  But you received the photograph of the backpack?

A.    I was issued the serial number that matched the list with witness accounts that allowed me to provide for a search warrant.

Q.    Okay.  Wasn't your testimony the other day that you received a photograph of the backpack?

A.    The photograph I received that I was referring to was the photograph of the description of where the sealed tags are in orange picture, picture of the orange backpack.

Q.    Okay.  So you never actually got the photographs that Mr. Hassard or Mr.—or the other gentleman sent over; is that correct?

A.    Correct, sir.

Q.    Okay.  So Remko never provided that to you?

A.    He didn't.  I do not believe so.

Q.    Okay.  Okay.  And did you ever receive the backpack?

A.    No, sir.

Q.    Okay.  Up until—from the time you got involved up until court, you'd never seen that backpack?

A.    No, I had requested they keep it in their possession, if needed, it was their property.

RP at 442-44.

The jury found Mr. Parker guilty of first degree possession of stolen property and first degree trafficking in stolen property. It acquitted him of all other charges and found that the crimes were not major economic offenses.

The trial court sentenced Mr. Parker to nine months' confinement and ordered him to pay restitution in an amount to be determined. At the restitution hearing that took place thereafter, defense counsel challenged liability for I-90's full insurance deductible ($10,000) and asked the court to reduce it by half. He otherwise said, "[A]lthough we have a figure that on its face appears to be probably pretty accurate, I don't know how they arrived at that figure," later repeating, "I don't have a lot of heartburn about the numbers, I think they are probably about right. I just don't know how they got them." RP at 583.

The court rejected the request to reduce restitution for I-90's deductible and entered an order requiring Mr. Parker to pay a total of $43,000, arrived at as follows:

- $23,572, the amount paid by I-90's insurer for I-90's insured loss, plus

- $10,000, the loss amount treated by the insurer as I-90's deductible, plus

- $9,428 in lost profits.

Clerk's Papers at 191. The $23,572 came from a trial exhibit the court apparently suggested at sentencing be the basis for the restitution award. At the trial court's request,

9

the exhibit was attached to the restitution order. It appears to be trial exhibit 521. The

lost profit amount was based on trial testimony that I-90's profit margin was 40 percent.[2]

Mr. Parker appeals.

ANALYSIS

I.     MR. PARKER DOES NOT DEMONSTRATE A MANIFESTLY UNCONSTITUTIONAL
       SEARCH

For the first time on appeal, Mr. Parker challenges whether the search warrant

obtained by Detective Horn was supported by probable cause. He contends he is entitled

to raise the issue because the constitutional error was manifest. He argues that given

Detective Horn's trial testimony, the warrant was based either on a reckless and material

misstatement of facts or on information falling short of probable cause.

"RAP 2.5(a) states the general rule for appellate disposition of issues not raised in

the trial court: appellate courts will not entertain them." *State v. Guzman Nunez*, 160 Wn.

App. 150, 157, 248 P.3d 103 (2011). An exception exists for manifest error affecting a

constitutional right. RAP 2.5(a)(3). "'Manifest' in RAP 2.5(a)(3) requires a showing of

actual prejudice." *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007).

"Essential to this determination is a plausible showing by the defendant that the asserted

error had practical and identifiable consequences in the trial of the case." *Id.* (internal

---

[2] The restitution order was later amended, to require payment of $43,000.70 in restitution.

quotation marks omitted) (quoting *State v. WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999)).

Mr. Parker acknowledges the seminal decision in *State v. McFarland*, in which challenges to a warrantless arrest were held not to be manifest constitutional error because no motion to suppress was made in the trial court, so it could not be determined from the record whether the court would have granted the motion. 127 Wn.2d 322, 334, 899 P.2d 1251 (1995).[3] "If the facts necessary to adjudicate the claimed error are not in the record on appeal, no actual prejudice is shown and the error is not manifest." *Id.* at 333.

Mr. Parker argues, however, that "[t]his is the rare case where the error is manifest and the factual record supports the conclusion that a constitutional violation occurred." Br. of Appellant at 29. He points to the fact that originally Detective Horn testified that after both seeing a photograph of the stolen and recovered pack and then being shown the pack itself, "[b]ased on information I now had and my understanding of probable cause . . . I drafted a search warrant." RP at 75. After it appeared from the testimony of others that the detective had not been provided with a photograph or shown the stolen and recovered pack, the detective testified, "I was issued the serial number that matched the

---

[3] In *McFarland*, the appellants assigned error in the alternative to ineffective assistance of counsel. Mr. Parker has not made a claim of ineffective assistance of counsel in his brief on appeal.

list with witness accounts that allowed me to provide for a search warrant." RP at 443.

Mr. Parker argues that in applying for the search warrant, Detective Horn "[e]ither . . .

[l]ied about his personal examination of the backpack" or "said that [he] had been told it

was a match . . . and Horn did nothing to confirm this information." Br. of Appellant at

31. In the latter case, Mr. Parker argues, "[n]o competent judge would have granted such

a warrant, and such a warrant would not be supported by probable cause." *Id.*

When a warrant is challenged, courts apply a lenient standard of review, it being

"'the design of the [state and federal] constitutions to encourage investigating officers to

seek the intervention of judicial officers'" to decide whether probable cause exists. *State*

*v. Chenoweth*, 160 Wn.2d 454, 478, 158 P.3d 595 (2007) (quoting *State v. Patterson*, 83

Wn.2d 49, 57, 515 P.2d 496 (1973). Probable cause may be based on hearsay, the tip of

even a confidential informant, and other unscrutinized evidence that would be

inadmissible at trial. *Id.* at 475. If a warrant is challenged on the basis that the issuing

magistrate was misled, the challenger must show that the warrant affiant recklessly or

intentionally made misstatements or omissions that were material. *Id.* at 479.

Mr. Parker is sanguine that Mr. Oosterhof's report that a stolen pack was

purchased at Cascade Playtime, standing alone, would not constitute probable cause. We

are not. We need not decide the issue on that basis, however, because Mr. Parker chose

not to designate Detective Horn's affidavit in support of the search warrant as part of the

record on appeal.[4]  We are unable to examine its accuracy or sufficiency.  Where it was possible for Mr. Parker to provide us with a full record, we will not speculate on the basis of something less.

II.     MR. PARKER DOES NOT DEMONSTRATE A USE OF FALSE TESTIMONY THAT
        VIOLATED HIS RIGHT TO DUE PROCESS

Mr. Parker next argues the State knowingly presented false testimony from Detective Horn and failed to correct it.

Prosecutors owe a duty not to introduce perjured testimony or use false evidence to convict a defendant.  The duty is grounded in the due process clause of the Fourteenth Amendment to the United States Constitution.  *State v. Finnegan*, 6 Wn. App. 612, 616, 495 P.2d 674 (1972).  The duty also applies where the government does not solicit the false testimony and merely fails to correct it.  *Napue v. Illinois*, 360 U.S. 264, 269-70, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).  A conviction obtained through the knowing use of perjury is fundamentally unfair and must be set aside if there is any reasonable likelihood the false testimony could have affected the jury's judgment.  *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 936, 952 P.2d 116 (1998).  To succeed on a *Napue* claim, Mr. Parker must show that: "(1) the testimony (or evidence) was actually false, (2) the prosecut[or] knew or should have known that the testimony was actually false, and (3)

---

[4] Nor did the State supplementally designate the affidavit.

that the false testimony was material." *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003). If a defendant has actual knowledge of the false testimony and fails to correct it, absent unusual circumstances, courts assume the defendant did so for strategic reasons and treat the *Napue* claim as waived. *United States v. Vega*, 813 F.3d 386, 391 (1st Cir. 2016) (citing *United States v. Mangual-Garcia*, 505 F.3d 1, 10-11 (1st Cir. 2007)).

Given that Detective Horn's testimony at trial took place in late April 2016, almost 16 months after execution of the search warrant and after the detective moved to Arizona and changed professions, the detective's initial testimony might well have been his sincerely held recollection, with the prosecutor having no reason to believe otherwise. Even the inconsistent testimony of other State witnesses would not have made it clear to the prosecutor, necessarily, which witness or witnesses recalled matters correctly. Detective Horn's testimony when called by the defense makes clear that he had by then realized that some of his original testimony was incorrect, however. If the prosecutor also realized it was incorrect, he could have saved himself grief on appeal by calling Detective Horn to correct the record, even if the prosecutor believed the mistaken testimony was immaterial.

The prosecutor elicited Mr. Oosterhof's testimony in the State's case that exhibit 21 was not a photograph of the stolen and recovered pack, but was instead a picture of an

14

ABS pack in I-90's inventory.  He also elicited Mr. Oosterhof's testimony that he never delivered the pack to Detective Horn.  Both belie an intent by the prosecutor to mislead.

When it came to exhibit 126, the material evidence was the testimony of Mr. Hassard and Mr. Aske that it was the pack purchased from Cascade Playground, and the undisputed testimony that its serial number matched that of an ABS pack from the stolen trailer.  The only materiality that Mr. Parker attributes to Detective Horn seeing the pack, or a picture of it, is in challenging the search warrant—a challenge we have rejected.

Finally, it is apparent from defense counsel's redirect examination of Detective Horn and his closing argument that he realized the detective's original testimony was in error, and capitalized on it.  If there was a *Napue* issue, it was waived.

III.    THE RESTITUTION ISSUE DOES NOT WARRANT REVIEW

Mr. Parker's last challenge is to the sufficiency of the record to support the restitution award.

Defense counsel stated during the restitution hearing that he did not know where the restitution figure came from, but he also said the amount being requested "appears to be probably pretty accurate," "I don't have a lot of heartburn about the numbers," and "I think they are probably about right."  RP at 583.  His only challenge was to the court's decision to order payment of I-90's full insurance deductible.  No other issue was preserved.  *See* RAP 2.5(a).

15

No. 34578-5-III
*State v. Parker*

Mr. Parker's passing argument on appeal on the insurance deductible issue is that the deductible "was not prorated for just the items found in Mr. Parker's possession." Br. of Appellant at 41. He does not identify evidence that would support a basis for prorating the deductible or the percentage payment that should have been ordered. There is too little reasoned argument to support review of the issue. *See* RAP 10.3(a)(6).

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Fearing, J.

_____
Pennell, C.J.

16