8 Wn. App. 829 (1973)
509 P.2d 382
THE STATE OF WASHINGTON, Respondent,
v.
KELLEY D. MESSINGER, Appellant.
No. 530-3.
The Court of Appeals of Washington, Division Three.
April 24, 1973.
Herbert H. Freise, for appellant (appointed counsel for appeal).
Arthur R. Eggers, Prosecuting Attorney, and Jerry A. Votendahl, Deputy, for respondent.
MUNSON, J.
Defendant appeals his conviction for murder in the first degree. A maximum term of life imprisonment was imposed.
In the early morning of August 7, 1970, the naked body of defendant's 16-year-old wife was discovered along a road outside the city of Walla Walla, Washington. The probable cause of death was later determined to be asphyxiation. After 4 months of investigation, the state successfully wove a web of circumstances sufficient to convince a jury that defendant had murdered his wife. Defendant did not take the stand at trial.
*831 We shall not set forth all of the facts or circumstances before the jury; to do so would unduly lengthen this opinion. However, a short statement of the pertinent facts is necessary.
Several hours after her unidentified body had been discovered, defendant reported his wife was missing. He discussed the couple's activities and actions the previous evening with law enforcement officers.[1] The officers verified some of these facts and later that day confirmed that the unidentified body was that of defendant's wife.
Later that same day defendant returned to the police station and restated the previous night's activities. He related how he and his wife had been to Fancy Dan's Restaurant and had left and returned home so decedent could repair a tear in her clothes. She was wearing a purple pant outfit and had a similar pair of pants which matched the outfit to which she anticipated changing. The second pair of pants, however, had burned in the dryer, and were ultimately thrown into the fireplace. Decedent then sewed the tear in the other pair of pants and the parties renewed their activities.
Defendant also advised the police of an argument they had in the restaurant on August 6. Their argument was supposedly feigned for the purpose of avoiding their previous boarder and babysitter, Sandy Wickenhagen. During the argument, decedent removed her ring and gave it to defendant, who in turn returned it to her. She placed it in her purse.
According to defendant's statements, he and decedent again left their home after the decedent's clothing was repaired. Upon returning home at about 11 p.m., decedent indicated a desire to sleep in their car in hopes that their cats would return to their newly acquired home; she did this. Defendant went to bed. He got up at 1 a.m., found her *832 gone and drove around town looking for her. Unable to find her, he returned home. At about 5 a.m. he again continued the search. Later that morning, defendant reported the disappearance of his wife to the police.
On August 7, after defendant's second discussion of these activities, the officers requested an opportunity to search his home seeking clues which might indicate the cause of her disappearance and death. Permission was readily granted by defendant, in a spirit of aid and cooperation in locating her killer. The police searched the residence for 1 hour but seized nothing. They did note, however, that decedent's purse was still in the kitchen and contained her glasses, but no ring. They further noted a warm residue still burning in the fireplace at a time some 18 hours after defendant, according to his own statement, set it.
The officers continued their investigation. On August 13, 1970, they again called defendant in to confer with him. At this time they preceded the discussion by advising defendant of those rights required under Miranda v. Arizona, 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974 (1966).
After discussing the case with defendant, they again requested the right to search his home. When defendant appeared to be hesitant about giving such consent, the officers sought and obtained a search warrant from the Superior Court for Walla Walla County. Thereafter defendant did consent to the search. At this time the officers seized the contents of the fireplace, a crumpled-up note ostensibly in decedent's handwriting, the contents of a vacuum sweeping of defendant's car and two blankets therefrom containing hair fibers. Again, defendant was not taken into custody and the officers left the premises.
No further contact was had between the officers and defendant except for several phone conversations and a note which defendant wrote when he took a short trip into Oregon.
In early December 1970, a close friend of defendant, Ron *833 Dixon, gave information implicating defendant in the murder. Based upon this information, plus the laboratory results regarding the hair fibers and contents of the fireplace, the officers sought and obtained a warrant for the arrest of defendant, charging him with first-degree murder.
At the time of defendant's arrest, he was given the Miranda warnings and was again requested to consent to a search of his premises. Defendant called his attorney. While it is disputed whether he discussed with his attorney the advisability of consenting to the search, at least the opportunity was afforded him to so discuss it. After the telephone call, defendant executed another consent to search. The officers returned to the home on December 12, 1970 and procured other items, only some of which were relevant to this crime.
[1] This case is based entirely upon circumstantial evidence. In State v. Richardson, 197 Wash. 157, 166, 84 P.2d 699 (1938), our Supreme Court cited O'Brien v. Commonwealth, 89 Ky. 354, 12 S.W. 471 (1889), for the following proposition:
"Necessarily, where the commission of crime can be shown only by proof of circumstances, the evidence should be allowed to take a wide range, otherwise the guilty person would often go unpunished. It is true there must be some connection between the fact to be proven and the circumstances offered in support of it, yet any fact which is necessary to introduce or explain another, or which afforded an opportunity for any transaction which is an issue, or shows facilities or motives for the commission of the crime, may be proven.... The purpose is to weave a net about the guilty, and often this can no more be done by proof of a single circumstance than the building of a house with a single brick."
See also State v. Spadoni, 137 Wash. 684, 243 P. 854 (1926); 1 J. Wigmore, Evidence § 38, et seq. (3d ed. 1940).
After careful review of the voluminous record and briefs submitted by counsel, we are satisfied the circumstantial evidence presented, if believed, is sufficient to support the jury's finding of guilt. The jury was properly instructed *834 that, as to circumstantial evidence, the facts and circumstances in evidence must be consistent with each other and with the guilt of the defendant and inconsistent with any reasonable theory of defendant's innocence. State v. Frazier, 81 Wn.2d 628, 631, 503 P.2d 1073 (1972); State v. Cerny, 78 Wn.2d 845, 849, 480 P.2d 199 (1971); State v. Douglas, 71 Wn.2d 303, 428 P.2d 535 (1967).
Analyzing the numerous assignments of error, we believe the primary issue is whether some of the state's evidence presented collateral matters either irrelevant or so unduly prejudicial to the defendant as to deny him a fair trial. The evidence challenged as being improperly admitted principally concerns alleged prior criminal misconduct by defendant. This evidence may be broken down into testimony relating to incidents alleged to have occurred prior to the death of decedent and subsequent thereto.
[2] It is a well-recognized rule that defendant must be tried for the offense or offenses charged; to introduce evidence of unrelated crimes is grossly and erroneously prejudicial. However, there are exceptions. Evidence of unrelated crimes of criminal misconduct is admissible to prove: (1) motive, (2) intent, (3) absence of accident or mistake, (4) common scheme or plan, and (5) identity. State v. Goebel, 36 Wn.2d 367, 218 P.2d 300 (1950). To these classifications may be added several others such as (6) evidence of the criminal acts which are an inseparable part of the whole deed, State v. Jordan, 79 Wn.2d 480, 487 P.2d 617 (1971), and (7) evidence of other offenses relative and necessary to prove an essential ingredient of the crime charged, State v. Dinges, 48 Wn.2d 152, 154, 292 P.2d 361 (1956).
A further corollary of this rule requires evidence which might be slightly relevant to be held inadmissible if its admission would be highly prejudicial. State v. Goebel, supra; State v. Portrey, 6 Wn. App. 380, 384, 492 P.2d 1050 (1972); State v. Sims, 4 Wn. App. 188, 480 P.2d 228 (1971); State v. Thrift, 4 Wn. App. 192, 480 P.2d 222 (1971).
*835 Defendant has generally challenged the use of these collateral matters without clearly enumerating the specific instances assigned as error. We have attempted to enumerate below the instances where evidence of collateral misconduct was introduced.

ACTS OF MISCONDUCT PRECEDING DEATH
These acts consist of marital infidelity known to decedent and defendant to have been committed by the other, and unsolved burglaries and larcenies allegedly committed by defendant and known to decedent. There is further testimony by Ron Dixon that defendant had come to him with a proposition that each should kill the other's wife, at a time, place and by a method unknown to the respective husband.
[3] The state justifies the introduction of this evidence under the motive exception to the general rule. We agree. Evidence of marital disharmony and infidelity may be relevant and material and be admissible if there exists some causal relationship or natural connection between the misconduct and the criminal act with which the accused stands charged. State v. Gaines, 144 Wash. 446, 258 P. 508 (1927). The acts introduced, when coupled with the fact that the parties had consulted an attorney a week earlier regarding a divorce, were properly admitted.
[4] Likewise, testimony concerning defendant's felonious activity known to his wife was relevant and material to the issue of motive. In cases where there is no proof of who committed the criminal act, proof of motive is important, and often decisive. State v. Barton, 198 Wash. 268, 277-79, 88 P.2d 385 (1939). Ron Dixon's testimony concerning defendant's proposal that they kill each other's wife was clearly admissible to show intent to commit murder.
[5] All facts are admissible which offer a reasonable inference or throw any light upon a contested issue. Whether the relevancy outweighs the prejudice is a matter for the trial court's discretion. State v. Schrager, 74 Wn.2d 75, 442 P.2d 1004 (1968); State v. Gersvold, 66 Wn.2d 900, 406 P.2d 318 (1965); State v. Spangler, 92 Wash. 636, 159 P. *836 810 (1916); State v. Ranicke, 3 Wn. App. 892, 479 P.2d 135 (1970). We find no abuse of discretion in admitting this evidence. The criticism of undue prejudice exemplified by State v. Goebel, supra, is not applicable to these facts.

ACTS OF MISCONDUCT SUBSEQUENT TO DEATH
Testimony relevant to this category included the following: (1) Defendant's alleged proclaimed intention to kill Sandy Wickenhagen, as well as other unidentified women, and place the bodies as decedent's had been placed for the stated purpose of making it appear as though a sex maniac was loose in the area, thereby taking the "heat off" defendant; (2) plans and preparations for the making of pipe bombs for the express purpose of killing one of the investigating officers of this crime, as well as one of the women witnesses; (3) the acquisition and disposition by defendant and others of previously stolen property, as well as vehicle license plates which were to be used in one of the proposed killings; and (4) solicitations by defendant toward a married woman living in Portland, Oregon to whom he gave some of decedent's clothing, including the purple pant outfit. Most of this testimony was given by defendant's friend, Ron Dixon, with some corroboration by other witnesses.
[6] As noted previously, the inadmissibility of this type of conduct is subject to several exceptions. The true test is whether the evidence is necessary and relevant to prove an essential ingredient of the crime charged. State v. Lew, 26 Wn.2d 394, 174 P.2d 291 (1946). Here, the identity of the person committing the act was, for all practical purposes, the principal issue. The evidence relating to the alleged comments, preparation, and uncompleted attempts by defendant to kill two specific people, as well as other unidentified persons, was relevant and material to the element of identity. We agree with the state's contention that this evidence was relevant to show "consciousness of guilt", and in that way supply evidence identifying defendant as the perpetrator of the crime.
It is relevant to show the conduct of the defendant *837 subsequent to the crime, when such conduct indicates a consciousness of guilt, an inconsistence with innocence, or the intent with which the act was committed.
1 C. Torcia, Wharton's Criminal Evidence § 209, at 437 (13th ed. 1972). See also 2 J. Wigmore, Evidence §§ 267, 273, 293 (3d ed. 1940).
Here, again, there must be a logical relationship between the subsequent misconduct and the question of defendant's guilt. The testimony of Ron Dixon supplied this relationship. Whether he was to be believed was for the jury's determination. Defense counsel's cross-examination was extensive and thorough; it appears to have been his theory that Dixon was in fact the murderer. By its verdict, it is obvious the jury believed Dixon. There can be no doubt that the conduct evidenced by this testimony was inconsistent with defendant's innocence. We find no error in admitting the first three classifications set forth above under this portion of the opinion. State v. Goebel, supra; State v. Kader, 201 Ore. 300, 270 P.2d 160, 173-75 (1954).
The fourth classification, namely, the solicitation by defendant toward a married woman, was erroneously admitted. While this testimony was part of the context of his meeting with this lady, the solicitations themselves do not go toward establishing any ingredient of the offense. However, on examination of the entire record, we are satisfied the admission of the fact of the solicitation was harmless error. State v. Martin, 73 Wn.2d 616, 440 P.2d 429 (1968).
Furthermore, we conclude the allegations of error assigned to the introduction of acts of misconduct said to have occurred subsequent to decedent's death, do not come within the condemnation of State v. Goebel, supra. We find no error.
The second assignment of error relates to defendant's objection to the opening statement by the state wherein the prosecutor referred to the evidence of collateral misconduct above referred to. Since we have deemed this evidence properly admitted, the prosecutor's opening comments were likewise proper. State v. Farley, 48 Wn.2d 11, 290 P.2d 987 *838 (1955); State v. Parker, 74 Wn.2d 269, 444 P.2d 796 (1968).
[7] Thirdly, defendant contends the searches conducted by the officers on August 7 and 13, and on December 12, were improper inasmuch as defendant had not been advised of his rights pursuant to Miranda, prior to consent to search having been obtained. Defendant was not entitled to have such rights read as a prerequisite to an elicitation of a consent to search. State v. Lyons, 76 Wn.2d 343, 458 P.2d 30 (1969); State v. Martin, 2 Wn. App. 904, 472 P.2d 607 (1970); see also State v. Rye, 2 Wn. App. 920, 471 P.2d 96 (1970). It should also be noted that Miranda warnings were given to defendant on August 13 and December 12. Furthermore, as of August 7 the finger of suspicion did not point to defendant with sufficient clarity to bring into being the necessity for advising him of his Miranda rights.
[8] In this same context, defendant contends his consents to search were given involuntarily because they were a product of deception, trickery and reliance on grief. The trial court found defendant had voluntarily waived his right to require the state to seek a warrant for any of the searches by voluntarily consenting to each search. The record reveals no deception or trickery in obtaining defendant's consents to the searches and, accordingly, we affirm the trial court's finding that the consents were voluntary and proper. We are satisfied he readily agreed to the officers' request in the spirit of aid and cooperation. Since we so conclude, it is unnecessary to consider defendant's further contention that the warrant to search his home on August 13 was invalid.[2]
[9] Defendant next claims he was denied the right to a speedy trial by the state's failure to charge him with this crime on August 7, 1970 and by not bringing the charge *839 until December 11, 1970. We find no merit to this contention. The Sixth Amendment right to a speedy trial "is activated only when a criminal prosecution has begun and extends only to those persons who have been `accused' in the course of that prosecution." United States v. Marion, 404 U.S. 307, 313, 30 L.Ed.2d 468, 92 S.Ct. 455 (1971). Since defendant did not become an "accused" until December 11, 1970, the Sixth Amendment speedy trial provision is inapplicable to this allegation. The due process clause of the Fourteenth Amendment does include preindictment delay which causes substantial prejudice to a defendant's right to a fair trial. United States v. Marion, supra; Dickey v. Florida, 398 U.S. 30, 26 L.Ed.2d 26, 90 S.Ct. 1564 (1970). However, there has been no showing of any unusual circumstances indicating defendant was prejudiced by the failure to formally charge him until December 11, 1970.
[10] Defendant also challenges the court's ruling on his motion for discovery contending notes and tapes in the prosecutor's possession were improperly disallowed. We find no error. Defendant was in fact granted broad discovery. The scope of discovery is entirely within the discretion of the trial court; we find no abuse of the court's discretion. State v. Thompson, 54 Wn.2d 100, 338 P.2d 319 (1959); State v. Smith, 77 Wn.2d 267, 461 P.2d 873 (1969).
In connection with this assignment of error, we note defendant, in May of 1972, allegedly discovered that the transcript of the electronic recording of defendant's conversation with the police officers on August 7 and 13 was inaccurate. We do not have the electronic recording nor the transcript before us. However, if in fact the allegation is true, the court in its order granting discovery specifically authorized defendant to verify a transcript furnished by the police department with the electronic recording. If defendant failed to take advantage of that authorization, such is neither the fault of the state nor the court. The opportunity was afforded defendant long before trial to make that determination.
*840 Defendant next alleges the prosecution violated its duty to disclose evidence beneficial to defendant. It is true the prosecutor has an affirmative duty to disclose evidence favorable to the accused and material to either negate guilt or mitigate the degree of the offense or punishment. State v. Finnegan, 6 Wn. App. 612, 495 P.2d 674 (1972), rev. denied, 81 Wn.2d 1001 (1972), cert denied, 410 U.S 967, 35 L.Ed.2d 702, 93 S.Ct. 1450 (1973); Brady v. Maryland, 373 U.S. 83, 10 L.Ed.2d 215, 83 S.Ct. 1194 (1963). In the instant case there is no showing the prosecutor withheld evidence favorable to defendant; therefore, no disclosure was required.
[11] Defendant next assigns error to the closing argument of the prosecutor in which he drew the jury's attention to a conversation between Ron Dixon, the defendant, and the girl with whom Dixon was living subsequent to the crime. This conversation made reference to defendant's contemplation of killing another woman or women to make the crime appear comparable to that of decedent's. In arguing this conversation, the prosecutor stated: "There was no testimony denying these conversations took place. They were sitting at dinner, the three of them around the table." Defendant promptly objected. The court waited until the conclusion of the prosecutor's argument before ruling; he then advised the state to desist from further argument. In fact, the prosecutor had desisted and made no further reference to "undenied or uncontradicted" testimony after defendant's objection. Calling attention to defendant's failure to contradict or deny that these conversations took place was error. Defendant was the only other person who could deny the conversations; the other parties had testified to their occurrence. Malloy v. Hogan, 378 U.S. 1, 12 L.Ed.2d 653, 84 S.Ct. 1489 (1964); Griffin v. California, 380 U.S. 609, 14 L.Ed.2d 106, 85 S.Ct. 1229 (1965). Such argument draws unfavored attention to defendant's failure to testify and exceeds the authorization allowed by State v. Litzenberger, 140 Wash. 308, 248 P. 799 (1926); State v. Ashby, 77 Wn.2d 33, 459 P.2d 403 (1969). However, our review of the *841 entire record convinces us the comment did not contribute to defendant's conviction, especially in light of the cautionary instruction to this effect that was ultimately given. State v. Martin, supra; Chapman v. California, 386 U.S. 18, 17 L.Ed.2d 705, 87 S.Ct. 824 (1967).
Defendant next assigns as error the failure of the state to disclose it had promised any of its witnesses immunity from prosecution. Each witness interrogated about such promises denied any were made. In fact, the state reiterated on oral argument before this court that no such promises had been made. Since both the state and their chief witness denied any promises having been made, and defendant having shown none, there is no basis upon which we can say error was committed. Brady v. Maryland, supra; Giglio v. United States, 405 U.S. 150, 31 L.Ed.2d 104, 92 S.Ct. 763 (1972); State v. Finnegan, supra.
Finally, defendant assigns error to several post-trial matters, one being an article in "Startling Detective" which relates the events of this crime. We have carefully reviewed these assignments and find them without merit.
Judgment affirmed.
GREEN, C.J., and McINTURFF, J., concur.
Petition for rehearing denied June 19, 1973.
Review denied by Supreme Court August 28, 1973.
NOTES
[1] We note that defendant's statements concerning his actions and activities were introduced at trial through testimony by police officers. Some of these statements, as reported by the officers, are related in this opinion.
[2] This contention was not raised at a suppression hearing held prior to trial, and was not included by way of a supplemental statement of facts filed in this court. We are advised a hearing was held by the superior court at the time of issuing the search warrant, and was recorded on an electronic device. Neither that recording nor a transcript thereof is before this court. The record reflects the officers relied upon the warrant to authorize them to conduct the search of August 13.