IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, Respondent, v. DEREK STEVEN LEBEDA, Appellant. | 87067-0-I DIVISION ONE UNPUBLISHED OPINION |

CHUNG, J. — Derek Steven Lebeda challenges his two convictions for assault in the second degree with firearm enhancements. He asserts the trial court abused its discretion in admitting hearsay statements and it violated his federal and state confrontation clause rights when it admitted part of a 911 call and the victims' statements to an officer. He further argues the prosecutor committed misconduct or, in the alternative, that he was denied effective assistance of counsel because his counsel did not object. He claims cumulative error and also asserts errors in his judgment and sentence. Finally, Lebeda filed a statement of additional grounds raising additional issues.

We affirm the convictions. We also remand to the trial court to strike from Lebeda's judgment and sentence the DNA fee, the victim penalty assessment (VPA), and the finding that Lebeda has the current or future ability to pay legal financial obligations.

FACTS

On December 16, 2022, a woman later identified as Jessie Grace called 911. Grace said she had been in a car in a Target parking lot with a man who held a gun to her head. Grace alerted 911 that her friend, Shauna La Fountain, remained in the car and was in the driver's seat, with the man pointing a gun at her head. An additional bystander, later identified as Joslyn Lamadrad,[1] called 911 on two separate occasions to report the incident. Initially, for a brief portion of the first call, Lamadrad's child reported that a person in the parking lot had a gun. Lamadrad then took over the call and provided additional information. She called a second time and provided her name and confirmed her phone number. The jury heard Grace's and Lamadrad's calls at trial.[2]

John Bass, a Kitsap County Sheriff's sergeant and crisis negotiator, located the car as soon as he arrived at the scene. After establishing a perimeter, Bass and other officers approached the vehicle. Upon approaching the vehicle, Bass asked the driver, La Fountain, to get out and throw the keys to the curb. La Fountain complied and ran toward other deputies nearby. According to Bass, she exited "swift[ly]" and appeared distressed.

Bass then told Lebeda, who was located in the back seat, to step out of the car with his hands raised. Lebeda replied but did not exit the vehicle, and initially Bass could not discern what he was saying. Bass moved in closer to "establish communication." Bass described Lebeda's positioning as having his

_____

[1] The caller's first name appears in one of the 911 call transcripts with the alternate spelling "Joslin."

[2] The trial court excluded a portion of Lamadrad's second 911 call. On appeal, Lebeda challenges only the admission of the statements from Lamadrad's first 911 call.

2

arm "wrapped over the driver's seat and hand going down." At some point, Lebeda said he was stuck and could not move.

When moving in closer, Bass asked where the gun was located. Lebeda responded it was "under [his] right hand." Bass then instructed Lebeda not to move, and Bass reached in and secured Lebeda's hands and removed a Taurus .40 caliber semiautomatic pistol. Although there were no rounds in the chamber, there were rounds in the accompanying magazine, and it was determined to be a usable firearm.

Cranac Surpris, a patrol deputy in the Kitsap County Sheriff's Office, was also on the scene. He could see only the back of Lebeda's head as he aided in establishing the perimeter. When La Fountain exited the vehicle, she ran toward Surpris and stated "[t]his person held a gun to my head." Surpris also testified that La Fountain appeared "frantic" and "very scared."

After securing Lebeda, Surpris went to talk to La Fountain and Grace, who were waiting near the Starbucks inside the Target. According to Surpris, both women appeared "scared and frantic." Initially, Surpris testified it was approximately 10 minutes between the incident and their conversation. The following day during further examination, Surpris added that the women had requested to the use the restroom before they spoke. Surpris could not recall how long they were in the restroom before he could interview them. Surpris reiterated that both women appeared upset before and after entering the restroom. During the interview, La Fountain repeatedly stated Lebeda held a gun to her head.

3

Neither La Fountain nor Grace testified at trial. Video surveillance from the store showed the car drive quickly into the parking lot and stop. A man in a black hoodie, suspected to be Michael Oliveri, an acquaintance of Lebeda, exited the vehicle. Oliveri did not testify at trial either. Lebeda was subsequently convicted of two counts of assault in the second degree with a firearm.

Lebeda timely appealed. He also filed a statement of additional grounds for review (SAG).

## DISCUSSION

Lebeda argues that the trial court erred when it admitted Lamadrad's first 911 call under the hearsay exception for present sense impressions and the "coffee shop statements" by Grace and La Fountain as excited utterances. He also contends that admitting the "coffee shop statements" and the final portion of Grace's 911 call violated his right to confrontation. Additionally, he asserts the prosecutor committed misconduct in a variety of ways, which he also claims constituted cumulative error. In the alternative, he asserts that even if this court does not conclude there was incurable prosecutorial misconduct, then he received ineffective assistance of counsel. Finally, he challenges the imposition of the DNA fee and the VPA, as well as the court's finding that he was not indigent, in his judgment and sentence.

I.    Admission of Hearsay

A.    Lamadrad 911 Call

Lebeda argues the trial court abused its discretion when it admitted most of Lamadrad's first 911 call under the "present sense impression" exception to

the hearsay rule. He argues it did not meet the requirements of the exception because most of the call was Lamadrad reporting what unidentified people said, not what she herself was perceiving or had perceived.

This court reviews admission of evidence under hearsay exceptions for abuse of discretion. Brundridge v. Fluor Fed. Servs., Inc., 164 Wn.2d 432, 450, 191 P.3d 879 (2008). A court abuses its discretion when it adopts a view that a reasonable person would not take, its decision is based on facts unsupported in the record, or its decision was reached by applying an incorrect legal standard. State v. Sisouvanh, 175 Wn.2d 607, 623, 290 P.3d 942 (2012).

The State argues Lebeda did not preserve his objection. While Lebeda objected to Lamadrad's call primarily based on relevancy, he also said he "[didn't] think it's a present sense impression other than the fact that she could testify, 'I'm watching this commotion. I have no independent knowledge of what it's about.' "[3] This objection was sufficient to preserve the issue for our review.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. ER 801(c). Hearsay is inadmissible as evidence, with a few well-established exceptions. ER 802. The "present sense impression" exception to the hearsay rule permits the admission of a "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." ER 803 (a)(1). "Present sense impression statements must grow out of the event reported and in some way

---

[3] Shortly thereafter, Lebeda's counsel said, "It probably meets the criteria for excited utterance and/or present sense impression, but that does not necessarily make it admissible. It still has to be relevant under ER 401 and 403. It's not relevant what other unnamed people are saying may be happening in the parking lot."

characterize that event." State v. Martinez, 105 Wn. App. 775, 783, 20 P.3d 1062 (2001), overruled on other grounds by State v. Rangel-Reyes, 119 Wn. App. 494, 81 P.3d 157 (2003). "The statement must be a 'spontaneous or instinctive utterance of thought,' evoked by the occurrence itself, unembellished by premeditation, reflection, or design. It is not a statement of memory or belief." Id. (quoting Beck v. Dye, 200 Wash. 1, 9-10, 92 P.2d 1113 (1939)).[4]

Lebeda concedes that there are admissible portions of the call during which Lamadrad describes what she can see and hear. However, Lebeda challenges other portions of the call during which it appears that she and her child are reporting what someone else said, as opposed to what they saw directly.

At the beginning of the call, the child reported they were at a Target and there is "somebody with a gun." The child clarified that they were in the parking lot, and when the 911 operator asked if someone is "being threatening with a gun or just carrying it," they reiterated, "Um, a person, um, over there has a gun." The child's statements describe the event while they are perceiving it, unembellished by premeditation, reflection, or design, and, thus, qualify as present sense impressions.

Lebeda also challenges Lamadrad's statements as merely reporting what others said. When she first takes the phone from the child, she reported what was happening: "Someone was saying this person has a gun, on the park bench,

---

[4] Lebeda argues that based on Martinez, 105 Wn. App. at 783, because the statements here were responses to questions, they cannot be present sense impressions. However, subsequent cases have clarified that responses are not automatically exempt from being present sense impressions. See, e.g., State v. Robinson, 189 Wn. App. 877, 889, 359 P.3d 874 (2015).

on the right side in front of Target. And there's a girl over there and nobody will go over there because this guy's got a gun." When asked what kind of gun, she responded, "I have no idea. I'm putting myself in my car and all I can do is hear yelling over there and someone saying he's got a gun." Like the child, Lamadrad narrated the events as they were happening and as she perceived them. The 911 operator asks about other people she can see and the clothes they are wearing, and Lamadrad describes a man with a black hood and jeans. The operator asks, "[H]e's the one we think has the gun?" and Lamadrad responds, "yeah. Somebody yelled he's got a gun," although she had not seen it. When asked if the person was holding the gun on himself or someone else, the following exchange took place:

Lamadrad: No. Someone else that they said.

Operator: Okay. Okay.

Lamadrad: It looks like another girl and she was screaming.

Operator: Can you still hear the screaming?

Lamadrad: She was yelling, "don't hurt me." No, I can't hear anything and I can't see her moving at all, either.

Lamadrad is describing and explaining an event while she is perceiving it, so her comments qualify as present sense impressions. The trial court did not abuse its discretion when it admitted Lamadrad's first 911 call.

B. Grace's and La Fountain's Statements to Surpris

Lebeda also argues the trial court abused its discretion when it admitted the "coffee shop" statements— Surpris's testimony about what La Fountain and Grace said to him when they spoke near the Starbucks inside Target—as excited

7

utterances. At trial, the prosecutor first asked Surpris what La Fountain told him in the Starbucks interview, Lebeda objected based on hearsay, the prosecutor responded that it was an excited utterance, and the court overruled the objection. However, when the prosecutor asked Surpris what Grace said, Lebeda did not object.[5]

An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803(a)(2). The party seeking to admit a statement as an excited utterance must meet three requirements: "(1) a startling event or condition occurred, (2) the declarant made the statement while under the stress of excitement of the startling event or condition, and (3) the statement related to the startling event or condition." State v. Ohlson, 162 Wn.2d 1, 8, 168 P.3d 1273 (2007). "Often, the key determination is whether the statement was made while the declarant was still under the influence of the event to the extent that the statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment." State v. Woods, 143 Wn.2d 561, 597, 23 P.3d 1046 (2001). The first two requirements "must . . . be established by evidence extrinsic to the declarant's bare words." State v. Young, 160 Wn.2d 799, 810, 161 P.3d 967 (2007). Said evidence "can include circumstantial evidence, such

---

[5] The State contends that Lebeda waived any objection to Grace's "coffee shop statements" to Surpris because he failed to object. But Surpris was discussing the same conversation with both La Fountain and Grace, and after the court overruled the objection to Surpris testifying about what La Fountain told him, the prosecutor asked Surpris only two more questions, including one about the demeanor of both women, before asking what Grace had told him. Thus, the objection could be construed to cover Surpris's testimony about his conversations with both Grace and La Fountain. We exercise our discretion to review Lebeda's challenges to Surpris's testimony about statements by both Grace and La Fountain.

as the declarant's behavior, appearance, and condition, appraisals of the declarant by others, and the circumstances under which the statement is made." Id.

Here, Surpris testified that he was part of a police response to 911 calls about someone holding a gun to a woman's head. He aided in establishing the perimeter around the vehicle, and he was the first officer La Fountain spoke to upon exiting the vehicle, when she stated someone had just held a gun to her head. Bass and Surpris also confirmed that a firearm was located near Lebeda as he was being apprehended. Thus, there was sufficient extrinsic evidence to establish a startling event took place, as is contemplated under the first requirement for an excited utterance.

The evidence also shows La Fountain and Grace made these statements while still under the stress and excitement caused by the event. Surpris described La Fountain as initially running toward him "as if she'd just been through something horrible." She had a "flush to the face," and she appeared scared at that moment, as "she spoke very fast," and "her voice [] crack[ed] a few times." Surpris also described Grace as "flustered as well," seeming "confused and scared." Overall, he described both as "scared and frantic." He also stated that when he went to speak with them near the Starbucks inside Target, which he recalled being less than ten minutes later,[6] they maintained that same level of fear and upset.

---

[6] Lebeda highlights that upon further examination, Surpris indicated that before he spoke to La Fountain and Grace, they used the restroom together; he could not recall how long they remained in the restroom; and he did not know what they did while in the restroom. To the extent this testimony impeaches his earlier time estimate, this evidence was not before the trial court

Finally, the statements clearly related to the event, as La Fountain repeated that she had a gun held to her head and both expressed a belief that Lebeda would follow through on his threats. Because the trial court's decision to admit La Fountain's and Grace's statements to Surpris in the Target Starbucks under the excited utterance exception was not based on untenable grounds or reasons, the trial court did not abuse its discretion.[7]

II.      Confrontation Clause

Lebeda also argues that the admission of the "coffee shop statements" and the last portion of Grace's 911 call violated his confrontation clause rights because the challenged statements are testimonial in nature. We disagree.

The Sixth Amendment of the United States Constitution provides criminal defendants the right to "be confronted with the witnesses against him." U.S. CONST. amend. VI. To protect this right, the confrontation clause bars admission of out-of-court testimonial statements unless the witness is unavailable and the defendant had prior opportunity for cross-examination. Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). But "not all out-of-court statements give rise to the protections of the confrontation right because not all speakers are acting as a 'witness' against the accused as described in the

when it made the initial determination, and thus cannot be a basis for an abuse of discretion. See State v. Bluford, 188 Wn.2d 298, 310, 393 P.3d 1219 (2017) ("a judge cannot abuse his or her discretion based on facts that do not yet exist").

[7] Additionally, the statements are cumulative and any error in admitting them would be harmless. State v. Ramirez-Estevez, 164 Wn. App. 284, 293, 263 P.3d 1257 (2011) (improper admission of evidence may be harmless where similar testimony is already admitted). Here, Surpris's testimony about La Fountain's and Grace's respective "coffee shop statements" repeat the same information from other sources: Grace's 911 call that she had a gun held to her head, her friend (La Fountain) had a gun held to her head, and the perpetrator waved a gun at others and appeared to be "freaking out"; La Fountain's statements to Surpris upon exiting the vehicle that Lebeda held a gun to her head.

Sixth Amendment." State v. Wilcoxon, 185 Wn.2d 324, 325, 373 P.3d 224 (2016) (quoting Crawford, 541 U.S. at 51). The confrontation clause applies only to testimonial statements. Id. at 333-34.

A testimonial statement "is designed to establish or prove some past fact, or is essentially a weaker substitute for live testimony at trial." Id. at 334. Statements that "were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" are testimonial. Crawford, 541 U.S. at 52. Nontestimonial statements are statements that have another primary purpose, such as when there is an ongoing emergency or to guide the provision of medical care. State v. Burke, 196 Wn.2d 712, 727-28, 478 P.3d 1096, cert. denied, 142 S. Ct. 182 (2021). The State has the burden of establishing that statements are not testimonial. State v. O'Cain, 169 Wn. App. 228, 235, 279 P.3d 926 (2012). The appellate court examines whether a defendant's right to confrontation was violated only if the statement is testimonial. Wilcoxon, 185 Wn.2d at 332. Appellate courts review alleged violations of the confrontation clause de novo. State v. Jasper, 174 Wn.2d 96, 108, 271 P.3d 876 (2012).

The State argues neither the challenge to the "coffee shop statements" nor the challenge to Grace's 911 call is preserved for appeal. Although the right to confrontation touches upon a constitutional right, it may be waived if the defendant does not raise the issue before the trial court. State v. Burns, 193 Wn.2d 190, 210-11, 438 P.3d 1183 (2019). This is so because, in part, without an objection, " 'nothing the trial court does or fails to do is a denial of the right,

and if there is no denial of a right, there is no error by the trial court, manifest or otherwise, that an appellate court can review.' " Id. at 211 (quoting State v. Fraser, 170 Wn. App. 13, 25-26, 282 P.3d 152 (2012)).

A. Grace's and La Fountain's Statements to Surpris

Lebeda objected to Surpris's testimony about La Fountain's and Grace's "coffee shop statements," but on the basis that it was hearsay, without specifically raising a confrontation clause issue. During a later conversation in which the parties are discussing La Fountain's anticipated testimony the following day, Lebeda again does not raise a confrontation clause issue. Rather, he reminds the court of his request to question La Fountain outside of the jury's presence, given his inability to previously obtain an interview or deposition from her. Finally, at the start of trial the following day, the State indicated that La Fountain had not appeared yet and requested a continuance to the afternoon, after testimony from Surpris concluded, to attempt to locate her. Lebeda objected to the continuance and asked the trial court require the State to call its witness immediately. The court declined and instead granted the continuance.

The only instance in which Lebeda tangentially challenges the "coffee shop statements" as a confrontation clause violation is Lebeda's motion to dismiss, well after the testimony at issue and after the State rested. In presenting the argument, Lebeda acknowledged the court had already determined the first portion of Grace's 911 call was nontestimonial, but stated the trial court had "not [ruled] on anything else." Following this statement, the only specific evidence he referenced was Grace's "unrefuted" 911 call. In denying the motion, the trial court

12

did not specify what evidence was being considered, but stated, "the analysis of Crawford has established that the statements that were made were not testimonial in nature." Because Lebeda never directly objected to the "coffee shop statements" as a confrontation clause violation, much less prior to Surpris's testimony, either pretrial or during the trial, the court could not act or fail to act in relation to the right. Thus, as any error is not preserved, we decline to review the issue.

       B. Later Portion of Grace 911 Call

As to Grace's 911 call, Lebeda challenges only the final portion when Grace was prompted to discuss what led to the incident, as this shifted the call from addressing an ongoing emergency to eliciting information for investigation of a possible crime.[8]

As a preliminary matter, there are multiple instances in which Lebeda alludes to a confrontation clause problem with the call, but he formally objected to the entirety of the call before jury selection began. Thus, the issue is preserved for review.

---

[8] This portion of the 911 call proceeded as follows:
[Operator] Do you know what started this today?

[Grace] No. It didn't, he (IA) he was, he was asking to get out of the car and he would and he didn't want to get out of the car, I guess and she says she was going to go see her kids and he was like, no you fucking not, bitch, I'm going to fucking, a which one of your friend you want me to hurt first? That's what he said, that's what he said, he's like which one of your friends you want me to hurt first? What one of your friends you want me to shoot? I was like, oh my god, are you serious? And he just pulled out the gun and (IA) and pointed it, you know what I'm saying? He's fucking crazy, dude. (IA) deal is, I have no idea what his deal is. He's on drugs or something, I guess, I mean, I don't know. You know she's been trying to (IA) I know she's scared shitless right now.

13

To determine whether a statement is testimonial or nontestimonial, courts apply the "primary purpose test." State v. Scanlan, 193 Wn.2d 753, 766, 445 P.3d 960 (2019), cert. denied, 140 S. Ct. 834 (2020); Burke, 196 Wn.2d at 726. "Courts must determine the primary purpose of an interrogation 'by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs.' " Burke, 196 Wn.2d at 726 (quoting Michigan v. Bryant, 562 U.S. 344, 370, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011)). Determining "whether an emergency exists and is ongoing is a highly context-dependent inquiry." Bryant, 562 U.S. at 363.

Here, while Grace stated, "They're about to make contact with the vehicle, he's getting out of the car right now," the fact that officers had just arrived does not obviate the emergency. The 911 operator was using information provided by Grace to direct the police to the right location:

[Operator] Do you see my officers in the area?

[Grace] Yes, yes, yes, I see them, I see them, I see them, they're right there.

[Operator] Are you able to point out where they're going?

[Grace] Yeah, I'm pointing, right, pointing right, right to them.

[Operator] Okay. Okay, just let me know when they make contact with the vehicle, okay?

The testimony and the video exhibits also indicate the police took some time to approach the vehicle after they arrived. Additionally, among the statements made by Grace, she indicated Lebeda's erratic behavior could be due to being under the influence of something, which would be helpful for officers in addressing the

situation. Immediately after Grace's answer, the operator asks if the officers are making contact, and Grace confirms they have. The call and transcript capture commands in the background that indicate the officers' efforts to gain control of the situation were ongoing. Thus, because the 911 call continued to discuss the ongoing emergency, we hold the statements were nontestimonial and that the trial court's admission of the statements did not violate the confrontation clause.[9]

### III.     Prosecutorial Misconduct

Lebeda challenges portions of the State's closing argument as misconduct. First, he claims prosecutor's comments that evidence was undisputed constituted comments on his decision not to testify and shifted the burden of proof.[10] Second, he challenges the statements urging jurors to "declare" the truth with their verdict. Finally, he challenges the State's

---

[9] Even if the admission of Grace's statement at the end of the 911 call was erroneous, the error is harmless. Confrontation clause errors are subject to a harmless error analysis. Wilcoxon, 185 Wn.2d at 335. "We find a constitutional error harmless only if convinced beyond a reasonable doubt any reasonable jury would reach the same result absent the error and where the untainted evidence is so overwhelming it necessarily leads to a finding of guilt." State v. Easter, 130 Wn.2d 228, 242, 922 P.2d 1285 (1996) (citations omitted).

Here, both the nontestimonial portion of Grace's 911 call and La Fountain's statement as she left the car were admitted and indicated that Lebeda held a gun to La Fountain's head. The "coffee shop statements" further corroborated these events. Surpris testified that both women were scared and shaken from the event. And, both Lebeda and the gun, which was under his hand upon being confronted by the officers, were found at the scene, circumstantially supporting the State's overall case. Thus, it is clear from the record that the admission of the final portion of Grace's 911 call did not alter the outcome of the State's case against Lebeda. Therefore, any error was harmless beyond a reasonable doubt.

[10] While "[s]ome improper prosecutorial remarks can touch on a constitutional right but still be curable by a proper instruction." State v. Smith, 144 Wn.2d 665, 679, 30 P.3d 1245 (2001). See, e.g., State v. Warren, 165 Wn.2d 17, 28, 195 P.3d 940 (2008) (improper statements that defendant did not enjoy benefit of any reasonable doubt were not prejudicial as the trial court provided a thorough curative instruction); State v. Emery, 174 Wn.2d 741, 756-57, 278 P.3d 653 (2012) (rejecting request to apply the constitutional harmless error standard to claims that a prosecutor's remarks concerned the presumption of their innocence and impermissibly shifted the burden of proof).

comparison of the "jury's role in deciding whether the State had proved guilt beyond a reasonable doubt with decisions jurors make everyday."

We generally review allegations of prosecutorial misconduct under an abuse of discretion standard. State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). The defendant bears the burden of showing the comments were improper and prejudicial. Id. "If the defendant did not object at trial, the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). "Reviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." Id. at 762. Under this heightened standard, the defendant must show that (1) no curative instruction would have obviated any prejudicial effect on the jury and (2) the misconduct resulted in prejudice that "had a substantial likelihood of affecting the jury verdict." Id. at 760.

"In the context of closing arguments, the prosecuting attorney has 'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence." State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). A prosecutor may also argue that evidence does not support the defense theory. State v. Russell, 125 Wn.2d 24, 87, 882 P.2d 747 (1994). Moreover, "[a] prosecuting attorney's allegedly improper remarks must be reviewed in the context of the total argument, the issues in the case, the

16

evidence addressed in the argument, and the instructions given to the jury." State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997).

### A. Shifting Burden of Proof

Lebeda points to numerous times during closing argument when the prosecutor made statements concerning unrebutted testimony presented at trial. He claims these statements impermissibly shifted the burden to him.

The prosecutor argued, "An assault happened. It's proven by all the evidence. And while it's my job to prove it to you, there is nothing that rebuts that an assault happened, nothing to say it didn't." Shortly thereafter, the prosecutor emphasized that "Jessie Grace and Shauna La Fountain were assaulted and held at gunpoint in that parking lot, the unrebutted truth [the jury] heard at trial."

Lebeda argued in closing that nobody knew what happened in the car that day. He discussed La Fountain's absence from trial and her refusal to speak with the defense before trial. He additionally discussed the hypothetical questions he intended to ask Grace, the absence of Oliveri, and his inability to challenge credibility. He also claimed that the video evidence was unhelpful because it did not show the interior of the car. He also speculated that La Fountain and Grace entered the Target restroom before Surpris could interview them to possibly hide drugs and ensure their stories matched.

Subsequently, in rebuttal, the prosecutor addressed Lebeda's closing argument by summarizing the evidence:

> What we know is, we have two very upset people who were in tears, terrified. Two highly trained officers, with no reason to doubt their credibility, came and said two terrified women who had just been deeply traumatized were allowed to comfort each other in the

bathroom, and they came back and gave the exact same consistent story as the one given to 911 and the one quickly given to Deputy Surpris as Shauna La Fountain ran from the police where she had been held hostage. That's what we have here, and that proves this case.

The prosecutor then reiterated the correct burden of proof: "it is my burden. He doesn't have to prove anything. But you get to listen to his arguments. They just aren't relevant. What's relevant is what happened in this car, not collateral things about his investigation . . . ." "You've only ever heard one version of what happened, the truth, which is that the defendant assaulted two people in it at gunpoint." He continued,

You heard it from the crime victims on scene. You heard it from a random 911 caller. You heard about their demeanor, their obvious terror, how everything suggested something terrible had happened in that car, and you've heard nothing to rebut that. This happened.

In his final summary of the evidence, the prosecutor argued, "And the defendant knows what happened. He knows he assaulted Ms. Grace and Ms. La Fountain. . . . He had a gun because he assaulted Ms. La Fountain and Ms. Grace. He held them at gunpoint. There's no other explanation for why he had that gun there."

"Comments by a prosecutor that certain testimony is undenied are not improper as long as there is no reference to who may be in a position to deny it." State v. Brett, 126 Wn.2d 136, 176, 892 P.2d 29 (1995). "Prosecutors may also comment on the defendant's failure to present evidence on a particular issue if persons other than the accused could have testified as to that issue." Id.

Here, the prosecutor's references to the lack of rebuttal evidence were general, not specifically about Lebeda's failure to rebut evidence with his own

testimony. Lebeda was not the only person who failed to testify; La Fountain, Grace, and Oliveri also did not testify. Indeed, much of the trial and following closing argument from both parties concerned highlighting the strengths and weaknesses of the circumstantial evidence supporting this case. Viewed in context, the prosecutor's statements were appropriate argument based on the evidence presented at trial as well as attempts to rebut Lebeda's arguments. See State v. Thorgerson, 172 Wn.2d 438, 448, 258 P.3d 43 (2011) (it is proper rebuttal to raise issues raised by defense).[11]

Lebeda also suggests the State improperly suggested that it had "met [its] burden of proving the crimes because [he] was in the car with the gun." However, this presentation of the argument is misleading. The prosecution made the comment in the context of discussing the to-convict instruction, following a discussion of each element and the corresponding evidence.[12] Then, the prosecutor summarized, "An assault happened. It's proven by all the evidence.

---

[11] Lebeda relies on State v. Messinger, 8 Wn. App. 829, 509 P.2d 382 (1973), and State v. Fiallo-Lopez, 78 Wn. App. 717, 899 P.2d 1294 (1995), to indicate these comments qualified as substantive comments on his right to silence and constituted improper burden shifting, but the cases are distinguishable. In Messinger, the prosecution's closing argument drew the jury's attention to unrebutted evidence concerning an inculpatory conversation in which every participant except the defendant testified at trial. 8 Wn. App. at 840. The court held that because the defendant was the only other person who could clarify or deny the contents of the conversation, the prosecutor's argument drew inappropriate attention to the defendant's right to silence. Id. Similarly, in Fiallo-Lopez, the prosecutor highlighted that there was "no attempt by the defendant to rebut the prosecution's evidence regarding his involvement in the drug deal," when the defendant was the only one who could have explained his presence at the sites of the drug deals. 78 Wn. App. at 729-30. This case is more like Brett, in which the court held it was not misconduct for the prosecutor to argue that there was "absolutely no evidence" that the gun was moved to cause an accidental discharge or that there was no evidence to support defendant's having used a needle for insulin, as other potential witnesses could have testified to these issues. 126 Wn.2d at 177.

[12] It first noted that Lebeda's presence in the car was clearly established by several witnesses, as well as the date and location of the confrontation. The prosecution then followed by identifying the question for the jury as "did the defendant assault Jessie Grace and Shauna La Fountain with a deadly weapon." The prosecutor then walked through the evidence for each element, referencing the relevant jury instructions.

And while it's my job to prove it to you, there is nothing that rebuts that an assault happened, nothing to say it didn't." The challenged statement did not impermissibly misstate the burden or the evidence.[13]

### B. Comments about Speaking the Truth

Lebeda challenges the prosecutor's references to speaking the truth as improper. One of the challenged statements was as follows:

> And your instructions tell you what a reasonable doubt is in Instruction No. 3. A reasonable doubt is not any doubt. It's not any possible doubt. A reasonable doubt is an abiding belief in the truth of the charge.

As the prosecutor is directly quoting the jury instruction, this statement was not improper.

> Lebeda also challenges the following statements:

> In voir dire we talked about the importance of speaking the truth, even an uncomfortable truth, even if we don't know the consequences of that truth. The truth of what happened here is, the defendant committed this crime, and it's important, when you get into deliberations, that you speak that truth.

The prosecutor later again requested the jurors to use their verdict to declare "the truth" and urged them to "speak [the truth]."

The jury's job is not to determine the truth of what happened; a jury therefore does not " 'speak the truth' " or " 'declare the truth.' " Emery, 174 Wn.2d at 760 (quoting State v. Anderson, 153 Wn. App. 417, 429, 220 P.3d 1273 (2009)). Rather, a jury's job is to determine whether the State has proved the

---

[13] Moreover, had the prosecutor misstated the defendant's obligations, this type of error is curable by instruction. Indeed, before the parties' closing arguments, the trial court instructed the jury that "The defendant is not required to testify. You may not use the fact that the defendant has not testified to infer guilt or to prejudice him in any way."

charged offenses beyond a reasonable doubt. Id. The prosecutor's statements suggesting that the jury needed to "speak the truth" were therefore improper.

Because there was no objection, the question is then whether it was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. Lebeda cannot meet this burden, as the remarks do not indicate the comments "engendered an incurable feeling of prejudice in the mind of the jury." Id. at 762. At most, the remarks could potentially confuse the jury about its role and the burden of proof. And had Lebeda objected, the trial court could have properly explained the jury's role, reiterated the State bears the burden of proof, and emphasized the defendant bears no burden. Id. at 762-65. Thus, while the statements were improper, they were not so flagrant and ill-intentioned that any resulting prejudice could not have been cured by an instruction.

### C. Comments About Reasonable Doubt Standard

Finally, Lebeda argues that the prosecutor committed misconduct by misrepresenting the reasonable doubt standard by equating it to everyday decision making and common sense.

Arguments that improperly equate reasonable doubt to everyday decision-making and common sense are improper.[14] State v. Anderson, 153 Wn. App. 417, 431, 220 P.3d 1273 (2009), rev. denied, 170 Wn.2d 1002 (2010). For example, in Anderson, the prosecutor argued that "beyond a reasonable doubt is a standard that you apply every single day." 153 Wn. App. at 425. The

---

[14] Lebeda also cites to Lindsay, 180 Wn.2d at 436, State v. Fuller, 169 Wn. App. 797, 825, 797, 282 P.3d 126 (2012), and State v. Walker, 164 Wn. App. 724, 732, 265 P.3d 191 (2011), to support the contention that these principles have been reaffirmed by later cases.

prosecutor subsequently gave examples of comparable everyday situations, like leaving children with a babysitter or changing lanes on a freeway. Id. Division Two held that this argument improperly "minimized the importance of the reasonable doubt standard and of the jury's role in determining whether the State had met its burden." Id. at 431.

Here, during voir dire, the prosecutor posed questions concerning circumstantial evidence. He described a scenario in which jurors would awake to snow on the ground, and they could determine whether it had snowed or not based on surrounding factors. He also asked the jurors to discuss possible extraneous factors they would utilize to determine he was an attorney. In the context of discussing intent and motive, the prosecutor posed this scenario to the jurors:

> Let's say you're selected for this jury and you're leaving. . .You're walking out of the courthouse. You see people in the courtroom—I'll go the traditional way—a man in a tuxedo, a woman in a white dress, people in the gallery, people holding hands.

> What are those people intending to do?

He then proceeded to discuss the differences between intent and motive in the context of the hypothetical. In his closing and rebuttal arguments, the prosecutor again referenced these hypotheticals. Further, at one point during closing, in discussing what a reasonable doubt entails, the prosecutor stated:

> There's a principle you've probably heard of. It's present in physics, philosophy, science, and the courtroom, and that's Occam's razor. Most of you probably know it, but I'm going to give my version of it to you now, which is basically the simplest answer is what happened. When you're presented with a lot of possibilities, the simplest answer is what happened.

The prosecutor then went into further detail as to how the alternative arguments presented by the defense did not make sense in context of the "Occam's razor" principle.

Even if the types of hypotheticals initially posed during voir dire and referenced during the prosecutor's closing were improper, Lebeda cannot show that the arguments here constituted flagrant and ill-intentioned conduct that could not be cured. The jury received instruction no. 3, which stated,

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

Jurors are presumed to follow instructions. Emery, 174 Wn.2d at 766. Had Lebeda objected to the prosecutor's arguments attempting to analogize common decisions to elucidate the concept of reasonable doubt, the court could have cured any prejudice with another instruction such as instruction no. 3. Thus, Lebeda cannot demonstrate that any prosecutor misconduct in defining reasonable doubt constituted reversible, incurable, flagrant and ill-intentioned misconduct.

### D. Cumulative Error

Lebeda argues that the cumulative effect of the instances of misconduct requires reversal. We disagree.

"A defendant cannot demonstrate flagrant and ill-intentioned conduct where a curative instruction could have cured any error." State v. Walker, 164 Wn. App. 724, 737, 265 P.3d 191 (2011) (citing State v. Corbett, 158 Wn. App.

23

576, 594, 242 P.3d 52 (2010)). "But the cumulative effect of repetitive prejudicial prosecutorial misconduct may be so flagrant that no instruction or series of instructions can erase their combined prejudicial effect." Id. (citing State v. Case, 49 Wn.2d 66, 73, 298 P.2d 500 (1956)). However, the doctrine does not apply where "the errors are few and have little or no effect on the outcome of trial." State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). As that is the case here, reversal is not warranted.

IV.     Ineffective Assistance of Counsel (IAC)

Lebeda argues in the alternative that if the court finds there was prosecutorial misconduct but it was subsequently cured, then counsel was ineffective for failing to object. The State argues that because a majority of the challenged conduct was proper, then the IAC claim fails, as Lebeda cannot demonstrate deficient performance or prejudice. We agree with the State.

For a successful claim of ineffective assistance of counsel, a defendant must establish both objectively deficient performance and resulting prejudice. Emery, 174 Wn.2d 754-55. To show deficient performance, the defendant must show that counsel's representation fell below an objective standard of reasonableness in light of all the circumstances. Strickland v. Washington, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "Courts engage in a strong presumption counsel's representation was effective." State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). And, "[d]eficient performance is not shown by matters that go to trial strategy or tactics." State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). Further, "[a] few or even several failures to

24

object are not usually cause for finding that an attorney's conduct has fallen below the objective standard of conduct." State v. Vazquez, 198 Wn.2d 239, 250, 494 P.3d 424 (2021).

Prejudice requires that "there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." McFarland, 127 Wn.2d at 335. The court need not consider both deficiency and prejudice if a petitioner fails to prove one. In re Pers. Restraint of Crace, 174 Wn.2d 835, 847, 280 P.3d 1102 (2012).

Here, Lebeda cannot demonstrate prejudice. As discussed above, any improper statements by the prosecutor could have been cured with an instruction and thus, were not prejudicial. As Lebeda cannot prove the prejudice prong of the Strickland test, his IAC claim fails.

V. Finding of Indigency, DNA Fee & VPA

Lebeda requests that we remand to the trial court to strike the boilerplate language finding he was not indigent, as it was entered in error, and to strike the VPA and DNA collection fee because he is indigent. Recent legislative amendments bar courts from imposing the VPA on indigent defendants, RCW 7.68.035(4), and wholly eliminated the DNA collection fee, RCW 43.43.7541. These amendments apply to matters pending on direct appeal. State v. Ellis, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023). The State agrees that the VPA and DNA collection fee should be stricken but claims the request to strike the boilerplate language finding is moot. As the court's oral ruling is not reflected correctly in the judgment and sentence, we remand to the trial court to strike from

25

Lebeda's judgment and sentence the VPA and DNA collection fee, as well as the language, "After an individualized inquiry on the record, the Court finds that the Defendant has the current or future ability to pay legal financial obligations; therefore, the Court imposes the following discretionary LFO's."

VI.     Statement of Additional Grounds for Review

Lebeda raises two issues in his SAG. First, he alleges further prosecutorial misconduct concerning a statement made in closing. Second, he argues the trial court abused its discretion when it did not admit a video statement from Oliveri into evidence.

First, Lebeda challenges an alleged statement by the prosecutor that La Fountain and Grace "did not show today, because they were in fear for their lives." He further claims that his lawyer objected and the trial court sustained his objection, instructed the jury to disregard the statement, and requested it be removed from the record. However, he does not provide citations to the report of proceedings, and the alleged exchange could not be located in the record on appeal. RAP 10.10(c) ("[T]he appellate court is not obligated to search the record in support of claims made in a defendant's statement of additional grounds for review."). This court may either " 'decline to address a claimed error when faced with a material omission in the record' " or "simply affirm the challenged decision if the incomplete record before us is sufficient to support the decision." Sisouvanh, 175 Wn.2d at 619 (quoting State v. Wade, 138 Wn.2d 460, 465, 979 P.2d 850 (1999)). As the appellate record does not include the action about which Lebeda complains, we decline to address it.

Lebeda's SAG also claims that the trial court erred when it refused to enter a video statement from Oliveri into evidence. During pretrial motions, Lebeda alerted the trial court that he received a video statement from Oliveri providing an allegedly exculpatory description of what happened in the car on December 16. He proceeded to explain the efforts he took and continued to take to contact Oliveri and discuss his testifying. Lebeda claims "Mr. Oliveri's video testimony was not allowed by the court, to be entered into evidence. This was because the prosecutor could not cross examine the witness." However, because the record does not indicate that Lebeda made any formal request to admit the evidence, it is insufficient to allow us to review Lebeda's argument on this issue.

CONCLUSION

We affirm the convictions. We also remand to the trial court to strike from Lebeda's judgment and sentence the DNA fee, the VPA, and the finding that Lebeda has the current or future ability to pay legal financial obligations.

_Chung, J._

WE CONCUR:

_Feldman, J._          _Díaz, J._